58 F.3d 654
 313 U.S.App.D.C. 94, 64 USLW 2039
 ACTION FOR CHILDREN'S TELEVISION; American Civil Liberties
Union; The Association of Independent Television Stations,
Inc.; Capital City/American Broadcasting Co., Inc.; CBS,
Inc.; Fox Television Stations, Inc.; Greater Media, Inc.;
Infinity Broadcasting Corporation; Motion Picture
Association of America, Inc.; National Association of
Broadcasters; National Public Radio; People for the
American Way; Post-Newsweek Stations, Inc.; Public
Broadcasting Service; Radio-Television News Directors
Association; Reporters Committee for Freedom of the Press;
Society of Professional Journalists, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents.
PACIFICA FOUNDATION; National Federation of Community
Broadcasters; American Public Radio; National Association
of College Broadcasters; Intercollegiate Broadcast System;
Pen American Center; Allen Ginsberg, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents.
 Nos. 93-1092, 93-1100.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued En Banc Oct. 19, 1994.
Decided June 30, 1995.
 
 Petitions for Review of an Order of the Federal Communications Commission.
 Timothy B. Dyk, with whom Barbara McDowell was on the briefs, argued the cause for petitioners Action for Children's Television, et al.
 Eric M. Lieberman, with whom Thomas C. Viles and John P. Crigler were on the briefs, argued the cause for petitioner Pacifica Foundation.
 Marjorie Heins was on the briefs for petitioner American Civil Liberties Union. Steven R. Shapiro entered an appearance.
 James J. Popham was on the briefs for petitioner The Ass'n of Independent Television Stations, Inc.
 Molly Pauker was on the briefs for petitioner Fox Television Stations, Inc.
 Dennis P. Corbett, Laura B. Humphries, and Steven A. Lerman were on the briefs for petitioner Infinity Broadcasting Corp.
 Henry L. Baumann and Steven A. Bookshester were on the briefs for petitioner Nat. Ass'n of Broadcasters.
 Theodore A. Miles was on the briefs for petitioner Nat. Public Radio. Karen Christensen entered an appearance.
 Andrew J. Schwartzman and Elliot M. Mincberg were on the briefs for petitioner People for the American Way.
 Martin Wald and Jonathan D. Blake entered appearances for petitioner Post-Newsweek Stations, Inc.
 Nancy H. Hendry and Paula A. Jameson were on the briefs for petitioner Public Broadcasting Service.
 J. Laurent Scharff was on the briefs for petitioner Radio-Television News Directors Ass'n.
 Jane E. Kirtley was on the briefs for petitioner Reporters Committee for Freedom of the Press.
 Bruce W. Sanford and Henry S. Hoberman were on the briefs for petitioner Soc. of Professional Journalists.
 Christopher J. Wright, Deputy Gen. Counsel, F.C.C. ("FCC"), with whom William E. Kennard, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, FCC, and Asst. Atty. Gen. Frank W. Hunger and Barbara L. Herwig and Jacob M. Lewis, Attys., U.S. Dept. of Justice, were on the briefs, argued the cause for respondents. Jane E. Mago, Clifford G. Pash, Jr., Renee Licht, and Peter Anthony Tenhula, Counsel, FCC, entered appearances for respondents.
 Before EDWARDS, Chief Judge, and WALD, SILBERMAN, BUCKLEY, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, and TATEL, Circuit Judges.
 Opinion for the court filed by Circuit Judge BUCKLEY, in which Circuit Judges SILBERMAN, STEPHEN F. WILLIAMS, GINSBURG, SENTELLE, KAREN LeCRAFT HENDERSON, and RANDOLPH concur.
 Dissenting opinion filed by Chief Judge HARRY T. EDWARDS.
 Dissenting opinion filed by Circuit Judge WALD, in which Circuit Judges ROGERS and TATEL join.
 BUCKLEY, Circuit Judge:
 
 
 1
 We are asked to determine the constitutionality of section 16(a) of the Public Telecommunications Act of 1992, which seeks to shield minors from indecent radio and television programs by restricting the hours within which they may be broadcast. Section 16(a) provides that, with one exception, indecent materials may only be broadcast between the hours of midnight and 6:00 a.m. The exception permits public radio and television stations that go off the air at or before midnight to broadcast such materials after 10:00 p.m.
 
 
 2
 We find that the Government has a compelling interest in protecting children under the age of 18 from exposure to indecent broadcasts. We are also satisfied that, standing alone, the "channeling" of indecent broadcasts to the hours between midnight and 6:00 a.m. would not unduly burden the First Amendment. Because the distinction drawn by Congress between the two categories of broadcasters bears no apparent relationship to the compelling Government interests that section 16(a) is intended to serve, however, we find the more restrictive limitation unconstitutional. Accordingly, we grant the petitions for review and remand the cases to the Federal Communications Commission with instructions to revise its regulations to permit the broadcasting of indecent material between the hours of 10:00 p.m. and 6:00 a.m.I. BACKGROUND
 
 
 3
 The Radio Act of 1927 provides that "[w]hoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both." 18 U.S.C. Sec. 1464 (1988). While all obscene speech is indecent, not all indecent speech is obscene. The Supreme Court has defined obscene material as
 
 
 4
 works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.
 
 
 5
 Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973). In enforcing section 1464 of the Radio Act, the Federal Communications Commission defines "broadcast indecency" as
 
 
 6
 language or material that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities or organs.
 
 
 7
 In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. Sec. 1464, 8 F.C.C.R. 704, 705 n. 10 (1993) ("1993 Report and Order "). This definition has remained substantially unchanged since it was first enunciated in In re Pacifica Foundation, 56 F.C.C.2d 94, 98 (1975).
 
 
 8
 While obscene speech is not accorded constitutional protection, "[s]exual expression which is indecent but not obscene is protected by the First Amendment...." Sable Communications of California, Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989). "The Government may, however, regulate the content of [such] constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest." Id. Noting that broadcasting has received the most limited First Amendment protection because of its unique pervasiveness and accessibility to children, the Supreme Court has held that the FCC may, in appropriate circumstances, place restrictions on the broadcast of indecent speech. See FCC v. Pacifica Foundation, 438 U.S. 726, 750-51, 98 S.Ct. 3026, 3041, 57 L.Ed.2d 1073 (1978) ("when the Commission finds that a pig has entered the parlor, the exercise of its regulatory power does not depend on proof that the pig is obscene.").
 
 
 9
 In In re Infinity Broadcasting Corp. of Pa., 3 F.C.C.R. 930 (1987) ("Reconsideration Order "), the Commission reviewed its decisions in three cases: In re Infinity Broadcasting Corp. of Pa., 2 F.C.C.R. 2705 (1987), In re Pacifica Foundation, Inc., 2 F.C.C.R. 2698 (1987), and In re Regents of the University of California, 2 F.C.C.R. 2703 (1987). One of these cases involved a morning broadcast; the other two dealt with programs that were aired after 10:00 p.m. In each of them, the agency found that a radio station had introduced particularly offensive pigs into American parlors in violation of section 1464. The offending morning broadcast, for example, contained "explicit references to masturbation, ejaculation, breast size, penis size, sexual intercourse, nudity, urination, oral-genital contact, erections, sodomy, bestiality, menstruation and testicles." Reconsideration Order, 3 F.C.C.R. at 932 (internal quotation marks omitted). The remaining two were similarly objectionable. See id. at 932-33.
 
 
 10
 The FCC reaffirmed the Government interest in safeguarding children from exposure to such speech and placed broadcasters on notice that because
 
 
 11
 at least with respect to the particular markets involved, available evidence suggested there were still significant numbers of children in the audience at 10:00 p.m. ... broadcasters should no longer assume that 10:00 p.m. is automatically the time after which indecent broadcasts may safely be aired. Rather, ... indecent material would be actionable (that is, would be held in violation of 18 U.S.C. Sec. 1464) if broadcast when there is a reasonable risk that children may be in the audience....
 
 
 12
 Id. at 930-31. The Commission noted, however, that it was its "current thinking" that midnight marked the time after which
 
 
 13
 it is reasonable to expect that it is late enough to ensure that the risk of children in the audience is minimized and to rely on parents to exercise increased supervision over whatever children remain in the viewing and listening audience.
 
 
 14
 Id. at 937 n. 47.
 
 
 15
 In our review of the Reconsideration Order in Action for Children's Television v. FCC, 852 F.2d 1332 (D.C.Cir.1988) ("ACT I" ), we rejected the argument that the Commission's definition of indecency was unconstitutionally vague and overbroad. Id. at 1338-40. But although we affirmed the declaratory ruling that found portions of the morning broadcast to be in violation of section 1464, id. at 1341, we vacated the Commission's rulings with respect to the two post-10:00 p.m. broadcasts. Id. In those instances, we considered the findings on which the Commission rested its decision to be "more ritual than real," id., because the Commission had relied on data as to the number of teenagers in the total radio audience rather than the number of them who listened to the radio stations in question. We were also troubled by the FCC's failure to explain why it identified the relevant age group as children aged 12 to 17 when it had earlier proposed legislation for the protection of only those under 12. Id. at 1341-42. We further concluded that "the FCC's midnight advice, indeed its entire position on channeling, was not adequately thought through." Id. at 1342.
 
 
 16
 Two months after our decision in ACT I, Congress instructed the Commission to promulgate regulations "enforc[ing] the provisions of ... section [1464] on a 24 hour per day basis." Pub.L. No. 100-459, Sec. 608, 102 Stat. 2186, 2228 (1988). The Commission complied by issuing a regulation banning all broadcasts of indecent material, which was immediately challenged by Action for Children's Television and others. The following year, we remanded the record to the Commission to enable it to solicit information relevant to the congressionally mandated 24-hour ban; and in 1989, the FCC issued a "Notice of Inquiry" for that purpose. In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. Sec. 1464, 4 F.C.C.R. 8358 (1989) ("1989 NOI ").
 
 
 17
 After analyzing the public comment received in response to the 1989 NOI, the Commission reported its conclusions in In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. Sec. 1464, 5 F.C.C.R. 5297 (1990) ("1990 Report "). In the 1990 Report, the FCC defined the category of persons to be protected under section 1464 as "children ages 17 and under." Id. at 5301. It then found that because
 
 
 18
 the narrowness with which courts have interpreted "obscenity" has commensurably broadened the range of patently offensive material that could be deemed "indecent" if broadcast ... [and in light of the evidence] that there is a reasonable risk that significant numbers of children ages 17 and under listen to radio and view television at all times of day and night[,] ... the compelling government interest in protecting children from indecent broadcasts would not be promoted effectively by any means more narrowly tailored than a 24-hour prohibition.
 
 
 19
 Id. at 5297.
 
 
 20
 We reviewed the 24-hour ban in Action for Children's Television v. FCC, 932 F.2d 1504 (D.C.Cir.1991) ("ACT II ). We again rejected petitioners' vagueness and overbreadth arguments, but we struck down the total ban on indecent broadcasts because "[o]ur previous holding in ACT I that the Commission must identify some reasonable period of time during which indecent material may be broadcast necessarily means that the Commission may not ban such broadcasts entirely." Id. at 1509.
 
 
 21
 Shortly after the Supreme Court denied certiorari in ACT II, 503 U.S. 913, 112 S.Ct. 1281, 117 L.Ed.2d 507 (1992), Congress again intervened, passing the Public Telecommunications Act of 1992, Pub.L. No. 102-356, 106 Stat. 949 (1992). Section 16(a) of the Act requires the Commission to
 
 
 22
 promulgate regulations to prohibit the broadcasting of indecent programming--
 
 
 23
 (1) between 6 a.m. and 10 p.m. on any day by any public radio station or public television station that goes off the air at or before 12 midnight; and
 
 
 24
 (2) between 6 a.m. and 12 midnight on any day for any radio or television broadcasting station not described in paragraph (1).
 
 
 25
 47 U.S.C. Sec. 303 note (Supp. IV 1992). Pursuant to this congressional mandate, the Commission published a notice of proposed rulemaking, In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. Sec. 1464, 7 F.C.C.R. 6464 (1992), and, in 1993, it issued regulations implementing section 16(a). 1993 Report and Order, 8 F.C.C.R. at 711; 47 C.F.R. Sec. 73.3999 (1994). These are challenged in the petition now before us.
 
 II. DISCUSSION
 
 26
 Petitioners present three challenges to the constitutionality of section 16(a) and its implementing regulations: First, the statute and regulations violate the First Amendment because they impose restrictions on indecent broadcasts that are not narrowly tailored to further the Government's interest, which petitioners define as the promotion of parental authority by shielding unsupervised children from indecent speech in the broadcast media; second, section 16(a) unconstitutionally discriminates among categories of broadcasters by distinguishing the times during which certain public and commercial broadcasters may air indecent material; and third, the Commission's generic definition of indecency is unconstitutionally vague. Petitioners also assert that our decisions in ACT I and ACT II compel the rejection of the newly enacted restrictions both because there are insufficient data to justify the new statutory ban and because the Commission continues to include children ages 12 to 17 in the protected class.
 
 
 27
 The Commission argues that the Government's interests extend beyond facilitating parental supervision to include protecting children from exposure to indecent broadcasts and safeguarding the home from unwanted intrusion by such broadcasts. The Commission asserts that restricting indecent broadcasts to the hours between midnight and 6:00 a.m. is narrowly tailored to achieve these compelling governmental interests. It defends the exception allowing public stations that go off the air at or before midnight to broadcast such materials after 10:00 p.m. on the basis that these stations would otherwise have no opportunity to air indecent programs.
 
 
 28
 At the outset, we dismiss petitioners' vagueness challenge as meritless. The FCC's definition of indecency in the new regulations is identical to the one at issue in ACT II, where we stated that "the Supreme Court's decision in Pacifica dispelled any vagueness concerns attending the [Commission's] definition," as did our holding in ACT I. 932 F.2d at 1508. Petitioners fail to provide any convincing reasons why we should ignore this precedent.
 
 
 29
 We now proceed to petitioners' remaining constitutional arguments.
 
 A. The First Amendment Challenge
 
 30
 It is common ground that "[s]exual expression which is indecent but not obscene is protected by the First Amendment." Sable, 492 U.S. at 126, 109 S.Ct. at 2836. The Government may, however,
 
 
 31
 regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest.
 
 
 32
 Id. Thus, a restriction on indecent speech will survive First Amendment scrutiny if the "Government's ends are compelling [and its] means [are] carefully tailored to achieve those ends." Id.
 
 
 33
 The Supreme Court has "long recognized that each medium of expression presents special First Amendment problems.... [O]f all forms of communication, it is broadcasting that has received the most limited First Amendment protection." Pacifica, 438 U.S. at 748, 98 S.Ct. at 3039-40. (citation omitted). The Court has identified two reasons for this distinction that are relevant here:
 
 
 34
 First, the broadcast media have established a uniquely pervasive presence in the lives of all Americans. Patently offensive, indecent material presented over the airwaves confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder. ... Because the broadcast audience is constantly tuning in and out, prior warnings cannot completely protect the listener or viewer from unexpected program content. ...
 
 
 35
 Second, broadcasting is uniquely accessible to children.... Other forms of offensive expression may be withheld from the young without restricting the expression at its source. Bookstores and motion picture theaters, for example, may be prohibited from making indecent material available to children. ... The ease with which children may obtain access to broadcast material, coupled with the concerns [over the well-being of youths] recognized in Ginsberg [v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) ], amply justifies special treatment of indecent broadcasting.
 
 
 36
 Id. at 748-50, 98 S.Ct. at 3040-41. As Justice Powell observed in Pacifica,
 
 
 37
 [t]he difficulty is that ... a physical separation of the audience [such as that possible in bookstores and movie theaters] cannot be accomplished in the broadcast media. ... This ... is one of the distinctions between the broadcast and other media ... [that] justif[ies] a different treatment of the broadcast media for First Amendment purposes.
 
 
 38
 438 U.S. at 758-59, 98 S.Ct. at 3045 (Powell, J., concurring in part and concurring in the judgment). Despite the increasing availability of other means of receiving television, such as cable (which is not immune to the concerns we address today, see Alliance for Community Media v. FCC, 56 F.3d 105, 123-125 (D.C.Cir.1995)), there can be no doubt that the traditional broadcast media are properly subject to more regulation than is generally permissible under the First Amendment.
 
 
 39
 Unlike cable subscribers, who are offered such options as "pay-per-view" channels, broadcast audiences have no choice but to "subscribe" to the entire output of traditional broadcasters. Thus they are confronted without warning with offensive material. See Pacifica, 438 U.S. at 748-49, 98 S.Ct. at 3039-40. This is "manifestly different from a situation" where a recipient "seeks and is willing to pay for the communication...." Sable, 492 U.S. at 128, 109 S.Ct. at 2837; see also Cruz v. Ferre, 755 F.2d 1415, 1420 (11th Cir.1985) (distinguishing Pacifica from cases in which cable subscriber affirmatively elects to have specific cable service come into home).
 
 
 40
 In light of these differences, radio and television broadcasts may properly be subject to different--and often more restrictive--regulation than is permissible for other media under the First Amendment. While we apply strict scrutiny to regulations of this kind regardless of the medium affected by them, our assessment of whether section 16(a) survives that scrutiny must necessarily take into account the unique context of the broadcast medium.
 
 1. The compelling Government interests
 
 41
 In examining the Government's interests in protecting children from broadcast indecency, it is important to understand that hard-core pornography may be deemed indecent rather than obscene if it is "not patently offensive" under the relevant contemporary community standards. The Second Circuit, for example, has found that the "detailed portrayals of genitalia, sexual intercourse, fellatio, and masturbation" contained in a grab bag of pornographic materials (which included such notorious films as "Deep Throat") are not obscene in light of the community standards prevailing in New York City. United States v. Various Articles of Obscene Merchandise, Schedule No. 2102, 709 F.2d 132, 134, 137 (2d Cir.1983). Therefore, as Justice Scalia has observed,
 
 
 42
 [t]he more narrow the understanding of what is "obscene," and hence the more pornographic what is embraced within the residual category of "indecency," the more reasonable it becomes to insist upon greater assurance of insulation from minors.
 
 
 43
 Sable, 492 U.S. at 132, 109 S.Ct. at 2840 (Scalia, J., concurring).
 
 
 44
 The Commission identifies three compelling Government interests as justifying the regulation of broadcast indecency: support for parental supervision of children, a concern for children's well-being, and the protection of the home against intrusion by offensive broadcasts. Because we find the first two sufficient to support such regulation, we will not address the third.
 
 
 45
 Petitioners do not contest that the Government has a compelling interest in supporting parental supervision of what children see and hear on the public airwaves. Indeed, the Court has repeatedly emphasized the Government's fundamental interest in helping parents exercise their "primary responsibility for [their] children's well-being" with "laws designed to aid [in the] discharge of that responsibility." Ginsberg v. New York, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968). This interest includes "supporting parents' claim to authority in their own household" through "regulation of otherwise protected expression." Pacifica, 438 U.S. at 749, 98 S.Ct. at 3040 (internal quotation marks omitted).
 
 
 46
 Although petitioners disagree, we believe the Government's own interest in the well-being of minors provides an independent justification for the regulation of broadcast indecency. The Supreme Court has described that interest as follows:
 
 
 47
 It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling. A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens. Accordingly, we have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights.
 
 
 48
 New York v. Ferber, 458 U.S. 747, 756-57, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113 (1982) (internal quotation marks and citations omitted); see also Prince v. Massachusetts, 321 U.S. 158, 165, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) ("It is [in] the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed ... citizens.").
 
 
 49
 While conceding that the Government has an interest in the well-being of children, petitioners argue that because "no causal nexus has been established between broadcast indecency and any physical or psychological harm to minors," Joint Brief for Petitioners at 32, that interest is "too insubstantial to justify suppressing indecent material at times when parents are available to supervise their children." Id. at 33. That statement begs two questions: The first is how effective parental supervision can actually be expected to be even when parent and child are under the same roof; the second, whether the Government's interest in the well-being of our youth is limited to protecting them from clinically measurable injury.
 
 
 50
 As Action for Children's Television argued in an earlier FCC proceeding, "parents, no matter how attentive, sincere or knowledgeable, are not in a position to really exercise effective control" over what their children see on television. In re Action for Children's Television, 50 F.C.C.2d 17, 26 (1974). This observation finds confirmation from a recent poll conducted by Fairbank, Maslin, Maullin & Associates on behalf of Children Now. The survey found that 54 percent of the 750 children questioned had a television set in their own rooms and that 55 percent of them usually watched television alone or with friends, but not with their families. Sixty-six percent of them lived in a household with three or more television sets. Compare 1989 NOI, 4 F.C.C.R. at 8361 (63 percent of households own more than one television and 50 percent of teenagers have a television in own bedrooms). Studies described by the FCC in its 1989 Notice of Inquiry suggest that parents are able to exercise even less effective supervision over the radio programs to which their children listen. According to these studies, each American household had, on average, over five radios, and up to 80 percent of children had radios in their own bedrooms, depending on the locality studied, id.; two-thirds of all children ages 6 to 12 owned their own radios, more than half of whom owned headphone radios. Id. at 8363. It would appear that Action for Children's Television had a firmer grasp of the limits of parental supervision 20 years ago than it does today.
 
 
 51
 With respect to the second question begged by petitioners, the Supreme Court has never suggested that a scientific demonstration of psychological harm is required in order to establish the constitutionality of measures protecting minors from exposure to indecent speech. In Ginsberg, the Court considered a New York State statute forbidding the sale to minors under the age of 17 of literature displaying nudity even where such literature was "not obscene for adults...." 390 U.S. at 634, 88 S.Ct. at 1278. The Court observed that while it was "very doubtful" that the legislative finding that such literature impaired "the ethical and moral development of our youth" was based on "accepted scientific fact," a causal link between them "had not been disproved either." Id. at 641-42, 88 S.Ct. at 1281-82. The Court then stated that it "d[id] not demand of legislatures scientifically certain criteria of legislation. We therefore cannot say that [the statute] ... has no rational relation to the objective of safeguarding such minors from harm." Id. at 642-43, 88 S.Ct. at 1282 (internal quotation marks and citations omitted).
 
 
 52
 In Bethel School District No. 403 v. Fraser, 478 U.S. 675, 684, 106 S.Ct. 3159, 3164-65, 92 L.Ed.2d 549 (1986), the Court did not insist on a scientific demonstration of psychic injury when it found that there was a compelling governmental interest in protecting high school students from an indecent speech at a high school assembly. It noted that its prior cases "recognize the obvious concern on the part of parents, and school authorities acting in loco parentis, to protect children--especially in a captive audience--from exposure to sexually explicit, indecent, or lewd speech." Id. In Bethel School District and Ginsberg, of course, the protection of children did not require simultaneous restraints on the access of adults to indecent speech. The Court, however, has made it abundantly clear that the Government's interest in the "well-being of its youth" justified special treatment of indecent broadcasting. Pacifica, 438 U.S. at 749-50, 98 S.Ct. at 3040-41 ("The ease with which children may obtain access to broadcast material, coupled with the concerns recognized in Ginsberg, amply justify special treatment of indecent broadcasting."); see also Sable, 492 U.S. at 131, 109 S.Ct. at 2839 ("compelling interest [in] preventing minors from being exposed to indecent telephone messages").
 
 
 53
 Finally, we think it significant that the Supreme Court has recognized that the Government's interest in protecting children extends beyond shielding them from physical and psychological harm. The statute that the Court found constitutional in Ginsberg sought to protect children from exposure to materials that would "impair[ ] [their] ethical and moral development." 390 U.S. at 641, 88 S.Ct. at 1282 (emphasis added). Furthermore, although the Court doubted that this legislative finding "expresse[d] an accepted scientific fact," id., it concluded that the legislature could properly support the judgment of
 
 
 54
 parents and others, teachers for example, who have [the] primary responsibility for children's well-being ... [by] ... assessing sex-related material harmful to minors according to prevailing standards in the adult community as a whole with respect to what is suitable material for minors.
 
 
 55
 Id. at 639, 88 S.Ct. at 1280 (internal quotation marks omitted).
 
 
 56
 The Court noted, in the context of obscenity, that
 
 
 57
 [i]f we accept the well nigh universal belief that good books, plays, and art lift the spirit, improve the mind, enrich the human personality, and develop character, can we then say that a ... legislature may not act on the corollary assumption that commerce in obscene books, or public exhibitions focused on obscene conduct, have a tendency to exert a corrupting and debasing impact leading to antisocial behavior.... The sum of experience ... affords an ample basis for legislatures to conclude that a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality, can be debased and distorted by crass commercial exploitation of sex.
 
 
 58
 Paris Adult Theatre I v. Slaton, 413 U.S. 49, 63, 93 S.Ct. 2628, 2638, 37 L.Ed.2d 446 (1973). Congress does not need the testimony of psychiatrists and social scientists in order to take note of the coarsening of impressionable minds that can result from a persistent exposure to sexually explicit material just this side of legal obscenity. The Supreme Court has reminded us that society has an interest not only in the health of its youth, but also in its quality. See Prince, 321 U.S. at 168, 64 S.Ct. at 443 ("A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies."). As Irving Kristol has observed, it follows "from the proposition that democracy is a form of self-government, ... that if you want it to be a meritorious polity, you have to care about what kind of people govern it." Irving Kristol, On the Democratic Idea in America 41-42, Harper & Row (1972).
 
 
 59
 We are not unaware that the vast majority of States impose restrictions on the access of minors to material that is not obscene by adult standards. See 1989 NOI, 4 F.C.C.R. at 8368-72. In light of Supreme Court precedent and the social consensus reflected in state laws, we conclude that the Government has an independent and compelling interest in preventing minors from being exposed to indecent broadcasts. See Sable, 492 U.S. at 126, 109 S.Ct. at 2836 (Government's compelling interest in well-being of minors extends "to shielding [them] from the influence of literature that is not obscene by adult standards").
 
 
 60
 Petitioners argue, nevertheless, that the Government's interest in supporting parental supervision of children and its independent interest in shielding them from the influence of indecent broadcasts are in irreconcilable conflict. The basic premise of this argument appears to be that the latter interest potentially undermines the objective of facilitating parental supervision for those parents who wish their children to see or hear indecent material.
 
 
 61
 The Supreme Court has not followed this reasoning. Rather, it treats the Government interest in supporting parental authority and its "independent interest in the well-being of its youth," Ginsberg, 390 U.S. at 640, 88 S.Ct. at 1281, as complementary objectives mutually supporting limitations on children's access to material that is not obscene for adults. Id. at 639-40, 88 S.Ct. at 1280-81. And while it is true that the decision in Ginsberg "denie[d] to children free access to books ... to which many parents may wish their children to have uninhibited access," id. at 674, 88 S.Ct. at 1298 (Fortas, J., dissenting), as Justice Brennan pointed out in writing for the majority, "the prohibition against sales to minors [did] not bar parents who so desire[d] from purchasing the [material] for their children." Id. at 639, 88 S.Ct. at 1280; see also Pacifica, 438 U.S. at 749-50, 98 S.Ct. at 3040-41; id. at 769-70, 98 S.Ct. at 3050-51 (Brennan, J., dissenting).
 
 
 62
 Today, of course, parents who wish to expose their children to the most graphic depictions of sexual acts will have no difficulty in doing so through the use of subscription and pay-per-view cable channels, delayed-access viewing using VCR equipment, and the rental or purchase of readily available audio and video cassettes. Thus the goal of supporting "parents' claim to authority in their own household to direct the rearing of their children," id., is fully consistent with the Government's own interest in shielding minors from being exposed to indecent speech by persons other than a parent. Society "may prevent the general dissemination of such speech to children, leaving to parents the decision as to what speech of this kind their children shall hear and repeat." Pacifica, 438 U.S. at 758, 98 S.Ct. at 3045 (Powell, J., concurring in part and concurring in the judgment).
 
 
 63
 The Government's dual interests in assisting parents and protecting minors necessarily extends beyond merely channeling broadcast indecency to those hours when parents can be at home to supervise what their children see and hear. It is fanciful to believe that the vast majority of parents who wish to shield their children from indecent material can effectively do so without meaningful restrictions on the airing of broadcast indecency.
 
 2. Least restrictive means
 The Government may
 
 64
 regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest.... [B]ut to withstand constitutional scrutiny, it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms.
 
 
 65
 Sable, 492 U.S. at 126, 109 S.Ct. at 2836-37 (internal quotation marks omitted). Petitioners argue that section 16(a) is not narrowly drawn to further the Government's interest in protecting children from broadcast indecency for two reasons: First, they assert that the class to be protected should be limited to children under the age of 12; and second, they contend that the "safe harbor" is not narrowly tailored because it fails to take proper account of the First Amendment rights of adults and because of the chilling effect of the 6:00 a.m. to midnight ban on the programs aired during the evening "prime time" hours. We address these arguments in turn.
 
 
 66
 a. Definition of "children"
 
 
 67
 Petitioners concede that it is appropriate to protect young children from exposure to indecent broadcasts. They remind us, however, that in ACT I we found it "troubling [that] the FCC ventures no explanation why it takes teens aged 12-17 to be the relevant age group for channeling purposes" in light of the fact that in an earlier legislative proposal, "the Commission would have required broadcasters to minimize the risk of exposing to indecent material children under age 12," 852 F.2d at 1341-42 (emphasis in original), and that in ACT II we directed the Commission on remand to address the question of the appropriate definition of "children." 932 F.2d at 1510.
 
 
 68
 Although, in ACT II, we made no mention of the fact, in its 1990 Report, the FCC defined "children" to include "children ages 17 and under." 5 F.C.C.R. at 5301. The agency offered three reasons in support of its definition: Other federal statutes designed to protect children from indecent speech use the same standard (citing 47 U.S.C.A. Sec. 223(b)(3) (Supp. II 1990) (forbidding indecent telephone communications to persons under 18)); most States have laws penalizing persons who disseminate sexually explicit materials to children ages 17 and under; and several Supreme Court decisions have sustained the constitutionality of statutes protecting children ages 17 and under (citing Sable, Ginsberg, and Bethel School District ). Id.
 
 
 69
 We find these reasons persuasive and note, as the Commission did in the 1993 Report and Order promulgating regulations pursuant to section 16(a), that the sponsor of that section, Senator Byrd, made specific reference to the FCC's finding that "there is a reasonable risk that significant numbers of children ages 17 and under listen to radio and view television at all times of the day or night." 138 Cong.Rec. Sec. 7308 (1992) (statement of Sen. Byrd). In light of Supreme Court precedent and the broad national consensus that children under the age of 18 need to be protected from exposure to sexually explicit materials, the Commission was fully justified in concluding that the Government interest extends to minors of all ages.
 
 
 70
 b. The midnight to 6:00 a.m. "safe harbor"
 
 
 71
 Although, for the reasons set forth in Part II. B. below, we will require the Commission to allow the broadcast of indecent material between 10:00 p.m. and 6:00 a.m., we will address the propriety of section 16(a)'s midnight to 6:00 a.m. safe harbor. We do so for two reasons: First, in addressing the "narrowly tailored" issue, the parties have focused their arguments on the evidence offered by the Commission in support of the section's 6:00 a.m. to midnight ban on indecent programming. Second, the principles we bring to bear in our analysis of the midnight to 6:00 a.m. safe harbor apply with equal force to the more lenient one that the Commission must adopt as a result of today's opinion. Although fewer children will be protected by the expanded safe harbor, that fact will not affect its constitutionality. If the 6:00 a.m. to midnight ban on indecent programming is permissible to protect minors who listen to the radio or view television as late as midnight, the reduction of the ban by two hours will remain narrowly tailored to serve this more modest goal.
 
 
 72
 In Pacifica, the Supreme Court found that it was constitutionally permissible for the Government to place restrictions on the broadcast of indecent speech in order to protect the well-being of our youth. 438 U.S. at 749-51, 98 S.Ct. at 3040-41. We have since acknowledged that such restrictions may take the form of channeling provided "that the Commission ... identify some reasonable period of time during which indecent material may be broadcast...." ACT II, 932 F.2d at 1509. The question, then, is what period will serve the compelling governmental interests without unduly infringing on the adult population's right to see and hear indecent material. We now review the Government's attempt to strike that balance.
 
 
 73
 The Supreme Court has stated that "a government body seeking to sustain a restriction on ... speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Edenfield v. Fane, --- U.S. ----, ----, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993); see also Turner Broadcasting System, Inc. v. FCC, --- U.S. ----, ----, 114 S.Ct. 2445, 2470, 129 L.Ed.2d 497 (1994) (same). The data on broadcasting that the FCC has collected reveal that large numbers of children view television or listen to the radio from the early morning until late in the evening, that those numbers decline rapidly as midnight approaches, and that a substantial portion of the adult audience is tuned into television or radio broadcasts after midnight. We find this information sufficient to support the safe harbor parameters that Congress has drawn.
 
 
 74
 The data collected by the FCC and republished in the Congressional Record for June 1, 1992, indicate that while 4.3 million, or approximately 21 percent, of "teenagers" (defined as children ages 12 to 17) watch broadcast television between 11:00 and 11:30 p.m., the number drops to 3.1 million (15.2 percent) between 11:30 p.m. and 1:00 a.m. and to less than 1 million (4.8 percent) between 1:45 and 2:00 a.m. 138 Cong.Rec. S7321. Comparable national averages are not available for children under 12, but the figures for particular major cities are instructive. In New York, for example, 6 percent of those aged 2 to 11 watch television between 11:00 and 11:30 p.m. on weekdays while the figures for Washington, D.C., and Los Angeles are 6 percent and 3 percent, respectively. Id. at S7322.
 
 
 75
 Concerning the morning portion of the broadcast restriction, the FCC has produced studies which suggest that significant numbers of children aged 2 through 17 watch television in the early morning hours. In the case of Seattle, one of two medium-sized media markets surveyed, an average of 102,200 minors watched television between the hours of 6:00 a.m. and 8:00 a.m., Monday through Friday; in Salt Lake City, the average was 28,000 for the period from 6:00 a.m. to 10:00 a.m. 1993 Report and Order, 8 F.C.C.R. at 708.
 
 
 76
 The statistical data on radio audiences also demonstrate that there is a reasonable risk that significant numbers of children would be exposed to indecent radio programs if they were broadcast in the hours immediately before midnight. According to the FCC, there is an average quarter-hour radio audience of 2.4 million teenagers, or 12 percent, between 6:00 a.m. and midnight. Id. Just over half that number, 1.4 million teenagers, listen to the radio during the quarter hour between midnight and 12:15 a.m. on an average night. 1990 Report, 5 F.C.C.R. at 5302.
 
 
 77
 It is apparent, then, that of the approximately 20.2 million teenagers and 36.3 million children under 12 in the United States, see 1989 NOI, 4 F.C.C.R. at 8366, n. 33; Nielsen Television Index National TV Ratings February 24-March 1, 1992 127, a significant percentage watch broadcast television or listen to radio from as early as 6:00 a.m. to as late as 11:30 p.m.; and in the case of teenagers, even later. We conclude that there is a reasonable risk that large numbers of children would be exposed to any indecent material broadcast between 6:00 a.m. and midnight.
 
 
 78
 Petitioners suggest that Congress should have used station-specific and program-specific data in assessing when children are at risk of being exposed to broadcast indecency. We question whether this would have aided the analysis. Children will not likely record, in a Nielsen diary or other survey, that they listen to or view programs of which their parents disapprove. Furthermore, changes in the program menu make yesterday's findings irrelevant today. Finally, to borrow the Commission's phrase, such station- and program-specific data do not take "children's grazing" into account. As the Supreme Court observed in Pacifica, "[b]ecause the broadcast audience is constantly tuning in and out, prior warnings cannot completely protect the listener or viewer from unexpected program content." 438 U.S. at 748, 98 S.Ct. at 3040. (In Pacifica, the objectionable broadcast was heard by a child in a car that was being driven by his father.) For this reason, we agree with the Commission that such data would not be "instructive." 1993 Report and Order, 8 F.C.C.R. at 711.
 
 
 79
 The remaining question, then, is whether Congress, in enacting section 16(a), and the Commission, in promulgating the regulations, have taken into account the First Amendment rights of the very large numbers of adults who wish to view or listen to indecent broadcasts. We believe they have. The data indicate that significant numbers of adults view or listen to programs broadcast after midnight. Based on information provided by Nielsen indicating that television sets in 23 percent of American homes are in use at 1:00 a.m., the Commission calculated that between 21 and 53 million viewers were watching television at that time. 1989 NOI, 4 F.C.C.R. at 8362; see also id. at 8381, 8393 (in Chicago, approximately 15 percent of adults watch broadcast television at midnight, and approximately 18 percent do so in Washington, D.C.). Comments submitted to the FCC by petitioners indicate that approximately 11.7 million adults listen to the radio between 10:00 p.m. and 11:00 p.m., while 7.4 million do so between midnight and 1:00 a.m. 1992 Comments at 8 n. 3 (reprinted in Joint Appendix at 348). With an estimated 181 million adult listeners, this would indicate that approximately 6 percent of adults listen to the radio between 10:00 p.m. and 11:00 p.m. while 4 percent of them do so between midnight and 1:00 a.m. Id.
 
 
 80
 While the numbers of adults watching television and listening to radio after midnight are admittedly small, they are not insignificant. Furthermore, as we have noted above, adults have alternative means of satisfying their interest in indecent material at other hours in ways that pose no risk to minors. We therefore believe that a midnight to 6:00 a.m. safe harbor takes adequate account of adults' First Amendment rights.
 
 
 81
 Petitioners argue, nevertheless, that delaying the safe harbor until midnight will have a chilling effect on the airing of programs during the evening "prime time" hours that are of special interest to adults. They cite, as examples, news and documentary programs and dramas that deal with such sensitive contemporary problems as sexual harassment and the AIDS epidemic and assert that a broadcaster might choose to refrain from presenting relevant material rather than risk the consequences of being charged with airing broadcast indecency. Whatever chilling effects may be said to inhere in the regulation of indecent speech, these have existed ever since the Supreme Court first upheld the FCC's enforcement of section 1464 of the Radio Act. The enactment of section 16(a) does not add to such anxieties; to the contrary, the purpose of channeling, which we mandated in ACT I and reaffirmed in ACT II, 852 F.2d at 1343-44; 932 F.2d at 1509, and which Congress has now codified, is to provide a period in which radio and television stations may let down their hair without worrying whether they have stepped over any line other than that which separates protected speech from obscenity. Thus, section 16(a) has ameliorated rather than aggravated whatever chilling effect may be inherent in section 1464.
 
 
 82
 Petitioners also argue that section 16(a)'s midnight to 6:00 a.m. channeling provision is not narrowly tailored because, for example, Congress has failed to take into consideration the fact that it bans indecent broadcasts during school hours when children are presumably subject to strict adult supervision, thereby depriving adults from listening to such broadcasts during daytime hours when the risk of harm to minors is slight. The Government's concerns, of course, extend to children who are too young to attend school. See Pacifica, 438 U.S. at 749, 98 S.Ct. at 3040 ("broadcasting is uniquely accessible to children, even those too young to read"). But more to the point, even if such fine tuning were feasible, we do not believe that the First Amendment requires that degree of precision.
 
 
 83
 In this case, determining the parameters of a safe harbor involves a balancing of irreconcilable interests. It is, of course, the ultimate prerogative of the judiciary to determine whether an act of Congress is consistent with the Constitution. Nevertheless, we believe that deciding where along the bell curves of declining adult and child audiences it is most reasonable to permit indecent broadcasts is the kind of judgment that is better left to Congress, so long as there is evidence to support the legislative judgment. Extending the safe harbor for broadcast indecency to an earlier hour involves "a difference only in degree, not a less restrictive alternative in kind." Burson v. Freeman, 504 U.S. 191, 210, 112 S.Ct. 1846, 1857, 119 L.Ed.2d 5 (1992) (reducing campaign-free boundary around entrances to polling places from 100 feet to 25 feet is a difference in degree, not a less restrictive alternative in kind); see also Buckley v. Valeo, 424 U.S. 1, 30, 96 S.Ct. 612, 640, 46 L.Ed.2d 659 (1976) (if some limit on campaign contributions is necessary, court has no scalpel to probe whether $2,000 ceiling might not serve as well as $1,000). It follows, then, that in a case of this kind, which involves restrictions in degree, there may be a range of safe harbors, each of which will satisfy the "narrowly tailored" requirement of the First Amendment. We are dealing with questions of judgment; and here, we defer to Congress's determination of where to draw the line just as the Supreme Court did when it accepted Congress's judgment that $1,000 rather than some other figure was the appropriate limit to place on campaign contributions.
 
 
 84
 Recognizing the Government's compelling interest in protecting children from indecent broadcasts, Congress channeled indecent broadcasts to the hours between midnight and 6:00 a.m. in the hope of minimizing children's exposure to such material. Given the substantially smaller number of children in the audience after midnight, we find that section 16(a) reduces children's exposure to broadcast indecency to a significant degree. We also find that this restriction does not unnecessarily interfere with the ability of adults to watch or listen to such materials both because substantial numbers of them are active after midnight and because adults have so many alternative ways of satisfying their tastes at other times. Although the restrictions burden the rights of many adults, it seems entirely appropriate that the marginal convenience of some adults be made to yield to the imperative needs of the young. We thus conclude that, standing alone, the midnight to 6:00 a.m. safe harbor is narrowly tailored to serve the Government's compelling interest in the well-being of our youth.
 
 B. The Public Broadcaster Exception
 
 85
 Section 16(a) permits public stations that sign off the air at or before midnight to broadcast indecent material after 10:00 p.m. See 47 U.S.C. Sec. 303 note. Petitioners argue that section 16(a) is unconstitutional because it allows the stations to present indecent material two hours earlier than all others.
 
 
 86
 Congress has provided no explanation for the special treatment accorded these stations other than the following: "In order to accommodate public television and radio stations that go off the air at or before 12 midnight, the FCC's enforcement authority would extend [to] the hour of 10 o'clock p.m. for those stations." 138 Cong.Rec. S7308 (statement of Sen. Byrd). The Commission has done little better. In its 1993 Report and Order, the agency explained the preference as follows:
 
 
 87
 In balancing the interests at stake, it appears reasonable to afford public broadcasters that do not operate during the regular safe harbor time period at least some opportunity to air indecent material as opposed to forcing them to extend their broadcast day beyond that which is economically feasible. Congress carved out this exception apparently as a kind of "rough accommodation" of its concerns for public broadcasters.
 
 
 88
 8 F.C.C.R. at 710. In its brief, the Commission justifies the disparate treatment accorded public and commercial broadcasters who sign off the air at midnight by suggesting that the latter may be able to finance the extension of their broadcasting day through the sale of advertising time. The agency also argues that allowing these public stations to begin broadcasting indecent material at 10:00 p.m. despite the significantly larger number of children in the radio and television audiences represents a reasonable trade-off because it serves the "substantial" (as opposed to "compelling") governmental interest in accommodating the free speech rights of those stations. The Commission does not address the phenomenon of "children's grazing" that it used so effectively in arguing against the relevance of program-specific statistics.
 
 
 89
 Because Congress has made no suggestion that minors are less likely to be corrupted by sexually explicit material that is broadcast by a public as opposed to a commercial station, and because section 16(a) was adopted in reluctant response to our rejection of the earlier statute imposing a total ban on indecent broadcasts, we can only conclude that Congress created the exception as a result of a misunderstanding of our directive in ACT II. Our instruction that the Commission must "afford broadcasters clear notice of reasonably determined times at which indecent material safely may be aired," 932 F.2d at 1509 (internal quotation marks omitted), did not require that every station be given some opportunity to broadcast indecent material. Rather, it was our expressed view that a clearly articulated channeling rule, as opposed to a case-by-case approach, was necessary to enable broadcasters to know when they might safely air indecent material. As the Supreme Court has observed, in this unique medium, "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969).
 
 
 90
 Whatever Congress's reasons for creating it, the preferential safe harbor has the effect of undermining both the argument for prohibiting the broadcasting of indecent speech before that hour and the constitutional viability of the more restrictive safe harbor that appears to have been Congress's principal objective in enacting section 16(a). In Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), the Supreme Court addressed a state sales tax that provided a tax exemption for religious, professional, trade, and sports journals, but not other magazines. The Court invalidated the selective application of the sales tax, in part because the articulated interest of encouraging "fledgling" publishers did not apply to struggling magazines other than those specified. Id. at 232, 107 S.Ct. at 1729. The Court found that even assuming there was a compelling interest in protecting such publishers, a selective exemption is not narrowly tailored to achieve that end. Id.; accord Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 591-92, 103 S.Ct. 1365, 1375-76, 75 L.Ed.2d 295 (1983) (state tax that exempted first $100,000 worth of ink and paper from state use tax unconstitutionally discriminated against small group of larger newspapers in violation of First Amendment).
 
 
 91
 Similarly, in City of Cincinnati v. Discovery Network, Inc., --- U.S. ----, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), a municipal ordinance imposed a ban on newsracks dispensing commercial publications because they were unsightly but did not impose this ban on newsracks dispensing newspapers. The Court struck down the regulation, finding that the distinction between commercial and noncommercial newsracks bore "no relationship whatsoever to the particular interests that the city has asserted. It [was] therefore an impermissible means of responding to the city's admittedly legitimate interests." Id. at ---, 113 S.Ct. at 1514 (emphasis in original).
 
 
 92
 Congress has failed to explain what, if any, relationship the disparate treatment accorded certain public stations bears to the compelling Government interest--or to any other legislative value--that Congress sought to advance when it enacted section 16(a). This is not a case like Alliance for Community Media, 56 F.3d at 127-28, in which we allowed the FCC to require the segregation and blocking of indecent programs on leased-access channels while not imposing a similar restriction on public access channels. There, the Commission was able to justify the disparate treatment by carefully documenting the relationship between the regulation at issue and the problem to be solved, namely, the uninvited intrusion of indecent material into leased-access channel programming. Here, Congress and the Commission have backed away from the consequences of their own reasoning, leaving us with no choice but to hold that the section is unconstitutional insofar as it bars the broadcasting of indecent speech between the hours of 10:00 p.m. and midnight.
 
 C. Our Decisions in ACT I and ACT II
 
 93
 Petitioners maintain that our holdings in ACT I and ACT II preclude our finding that section 16(a) is narrowly tailored to achieve the Government's compelling interest as defined by them. While we have addressed their principal arguments above--and have done so in a manner that we believe to be consistent with our holdings in those two cases--we point to certain essential differences between this case and those with which we dealt in ACT I and ACT II.
 
 
 94
 ACT I involved an assessment of the constitutionality of channeling decisions that had been made by the FCC on its own initiative; here we are dealing with an act of Congress which, as the Supreme Court has pointed out, enjoys a "presumption of constitutionality" that is not to be equated with "the presumption of regularity afforded an agency in fulfilling its statutory mandate." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 n. 9, 103 S.Ct. 2856, 2866 n. 9, 77 L.Ed.2d 443 (1983). It is true, of course, that in ACT II we vacated a total ban on indecent broadcasts that Congress had attached to an appropriations bill. In doing so, we stated that our holding in ACT I
 
 
 95
 necessarily means that the Commission may not ban such broadcasts entirely. The fact that Congress itself mandated the total ban on broadcast indecency does not alter our view that, under ACT I, such a prohibition cannot withstand constitutional scrutiny.
 
 
 96
 932 F.2d at 1509. Having declared Congress's 24-hour ban unconstitutional because of its totality, we remanded the case to the Commission with instructions to redetermine,
 
 
 97
 after a full and fair hearing, the times at which indecent material may be broadcast, to carefully review and address the specific concerns we raised in ACT I: among them, the appropriate definitions of "children" and "reasonable risk" for channeling purposes, the paucity of station- or program-specific audience data expressed as a percentage of the relevant age group population, and the scope of the government's interest in regulating indecent broadcasts.
 
 
 98
 Id. at 1510 (internal quotation marks and ellipsis omitted). In doing so, we made no mention of the fact that subsequent to our decision in ACT I, the Commission had accumulated substantial information and comments relating to the banning of indecent broadcasts and had stated its reasons for defining "children" to include those aged 12 to 17. ACT II, therefore, cannot be seen as a rejection of the sufficiency of either.
 
 
 99
 While our holdings in this case are generally consistent with those in our two earlier decisions, we acknowledge that there are significant differences in our approach to certain of the issues. To the degree that the analyses in those earlier cases disagree with that contained in today's decision, they are, of course, superseded.
 
 III. CONCLUSION
 
 100
 "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 2545, 105 L.Ed.2d 342 (1989). The Constitution, however, permits restrictions on speech where necessary in order to serve a compelling public interest, provided that they are narrowly tailored. We hold that section 16(a) serves such an interest. But because Congress imposed different restrictions on each of two categories of broadcasters while failing to explain how this disparate treatment advanced its goal of protecting young minds from the corrupting influences of indecent speech, we must set aside the more restrictive one. Accordingly, we remand this case to the Federal Communications Commission with instructions to limit its ban on the broadcasting of indecent programs to the period from 6:00 a.m. to 10:00 p.m.
 
 
 101
 It is so ordered.
 
 HARRY T. EDWARDS, Chief Judge, dissenting:
 
 102
 In this case, the majority upholds as constitutional a total ban of "indecent" speech on broadcast television and radio between the hours of 6 a.m. and midnight.[1] The majority readily acknowledges that indecent speech (as distinguished from obscene speech) is fully protected by the Constitution, and that the Government may not regulate such speech based on its content except when it chooses the least restrictive means to effectively promote an articulated compelling interest. In this case, the Government fails to satisfy the acknowledged constitutional strictures.
 
 
 103
 The Government advances three goals in support of the statute: first, it claims that the statute facilitates parental supervision of the programming their children watch and hear; second, it claims that the ban promotes the well-being of minors by protecting them from indecent programming assumed to be harmful; and, finally, it contends that the ban preserves the privacy of the home. Enforcement Order, 8 F.C.C.R. at 705-06. The majority finds the first two interests compelling, and so finds it unnecessary to address the third. I, too, will focus on the first two interests, which I find to be unsupported.
 
 
 104
 As an initial matter, I do not comprehend how the two interests can stand together. "Congress may properly pass a law to facilitate parental supervision of their children, i.e., a law that simply segregates and blocks indecent programming and thereby helps parents control whether and to what extent their children are exposed to such programming. However, a law that effectively bans all indecent programming--as does the statute at issue in this case--does not facilitate parental supervision. In my view, my right as a parent has been preempted, not facilitated, if I am told that certain programming will be banned from my ... television. Congress cannot take away my right to decide what my children watch, absent some showing that my children are in fact at risk of harm from exposure to indecent programming." Alliance for Community Media v. FCC, 56 F.3d 105, 145 (D.C.Cir.1995) (Edwards, C.J., dissenting).
 
 
 105
 Furthermore, the two interests--facilitating parental supervision and protecting children from indecent material--fare no better if considered alone. With respect to the alleged interest in protecting children, although the majority strains mightily to rest its finding of harm on intuitive notions of morality and decency (notions with which I have great sympathy), the simple truth is that "[t]here is not one iota of evidence in the record ... to support the claim that exposure to indecency is harmful--indeed, the nature of the alleged 'harm' is never explained." Id. There is significant evidence suggesting a causal connection between viewing violence on television and antisocial violent behavior;[2] but, as was conceded by Government counsel at oral argument in this case, the FCC has pointed to no such evidence addressing the effects of indecent programming. With respect to the interest in facilitating parental supervision, the statute is not tailored to aid parents' control over what their children watch and hear; it does not, for example, "segregate" indecent programming on special channels, as was the case in Alliance for Community Media,[3] nor does it promote a blocking device which individuals control. Rather, section 16(a) involves a total ban of disfavored programming during hours when adult viewers are most likely to be in the audience.
 
 
 106
 Because the statutory ban imposed by section 16(a) is not the least restrictive means to further compelling state interests, the majority decision must rest primarily on a perceived distinction between the First Amendment rights of broadcast media and cable (and all other non-broadcast) media. The majority appears to recognize that section 16(a) could not withstand constitutional scrutiny if applied against cable television operators; nonetheless, the majority finds this irrelevant because it believes that "there can be no doubt that the traditional broadcast media are properly subject to more regulation than is generally permissible under the First Amendment." This is the heart of the case, plain and simple.
 
 
 107
 Respectfully, I find the majority's position flawed. First, because I believe it is no longer responsible for courts to provide lesser First Amendment protection to broadcasting based on its alleged "unique attributes," I would scrutinize section 16(a) in the same manner that courts scrutinize speech restrictions of cable media.
 
 
 108
 Second, I find it incomprehensible that the majority can so easily reject the "public broadcaster exception" to section 16(a), see note 1 supra, and yet be blind to the utterly irrational distinction that Congress has created between broadcast and cable operators. No one disputes that cable exhibits more and worse indecency than does broadcast. And cable television is certainly pervasive in our country. Today, a majority of television households have cable,[4] and over the last two decades, the percentage of television households with cable has increased every year.[5] However, the Government does not even attempt to regulate cable with the same heavy regulatory hand it applies to the broadcast media. There is no ban between 6 a.m. and midnight imposed on cable. Rather, the Government relies on viewer subscription and individual discretion instead of regulating commercial cable. Viewers may receive commercial cable, with all of its indecent material, to be seen by adults and children at any time, subject only to the viewing discretion of the cable subscriber. "Furthermore, many subscribers purchase cable service to get improved [broadcast] television reception, and a number of basic cable subscriptions are packaged to include channels that offer some indecent programming; so these subscribers will get indecent programming whether they want it or not." Id., 56 F.3d at 149 (Edwards, C.J., dissenting). In other words, the Government assumes that this scheme, which relies on personal subscription and individual discretion, fosters parental choice and protects children without unduly infringing on the free speech rights of cable operators and the adult audience.
 
 
 109
 If exposure to "indecency" really is harmful to children, then one wonders how to explain congressional schemes that impose iron-clad bans of indecency on broadcasters, while simultaneously allowing a virtual free hand for the real culprits--cable operators. And the greatest irony of all is that the majority holds that section 16(a) is constitutional in part because, in allowing parents to subscribe to cable television as they see fit, Congress has facilitated parental supervision of children. In other words, Congress may ban indecency on broadcast television because parents can easily purchase all the smut they please on cable! I find this rationale perplexing.
 
 
 110
 At bottom, I dissent for three reasons: First, the Government's asserted interests in facilitating parental supervision and protecting children from indecency are irreconcilably in conflict in this case. Second, the Commission offers no evidence that indecent broadcasting harms children. And although it is an easy assumption to make--that indecent broadcasting is harmful to minors--Supreme Court doctrine suggests that the Government must provide some evidence of harm before enacting speech-restrictive regulations. Finally, the Government has made no attempt to search out the least speech-restrictive means to promote the interests that have been asserted. For these reasons, section 16(a) should be struck down as unconstitutional.
 
 
 111
 I. FIRST AMENDMENT PROTECTIONS FOR THE BROADCAST MEDIA
 
 
 112
 Over the years, Congress and the Commission have regulated the broadcast media more heavily than they have regulated the non-broadcast media. And courts have upheld speech-restrictive regulations imposed on broadcast which undoubtedly would have been struck down were they imposed on other media. See, e.g., Turner Broadcasting Sys., Inc. v. FCC, --- U.S. ----, ----, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497 (1994) ("TBS") ("It is true that our cases have permitted more intrusive regulation of broadcast speakers than of speakers in other media.")[6] ; FCC v. League of Women Voters of California, 468 U.S. 364, 376, 104 S.Ct. 3106, 3115, 82 L.Ed.2d 278 (1984) ("Were a similar ban ... applied to newspapers and magazines, we would not hesitate to strike it down as violative of the First Amendment."). The Supreme Court has explained its tendency to uphold speech-restrictive regulations of broadcast as providing the broadcast media with limited First Amendment protection. See, e.g., FCC v. Pacifica Found., 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978) (plurality opinion) ("[O]f all forms of communication, it is broadcasting that has received the most limited First Amendment protection.").
 
 
 113
 The absurdity of this bifurcated approach--applying a relaxed level of scrutiny to content-based regulations of broadcast and a strict level of scrutiny for content-based regulations of non-broadcast media--is most apparent in a comparison of the Supreme Court's analysis of broadcast and cable. In Pacifica, a plurality of the Court applied a reduced level of scrutiny in determining the First Amendment rights of a broadcasting station. 438 U.S. at 748-50, 98 S.Ct. at 3039-41. Last year, however, a majority of the Court held that cable television is entitled to the same First Amendment protection as all other non-broadcast media. TBS, --- U.S. at ----, 114 S.Ct. at 2456-57. There is no justification for this apparent dichotomy in First Amendment jurisprudence. Whatever the merits of Pacifica when it was issued almost 20 years ago, it makes no sense now.[7]
 
 
 114
 The justification for the Supreme Court's distinct First Amendment approach to broadcast originally centered on the notion of spectrum scarcity. The electromagnetic spectrum was physically limited--there were more would-be broadcasters than frequencies available and broadcasters wishing to broadcast on the same frequency may have interfered with each other--and required regulation to assign frequencies to broadcasters. See TBS, --- U.S. at ----, 114 S.Ct. at 2456. The Court reasoned that the Government could impose limited content restraints and certain affirmative obligations on broadcasters on account of spectrum scarcity. See id. at ----, 114 S.Ct. at 2457 (citing Red Lion, 395 U.S. at 390, 89 S.Ct. at 1806-07). In 1978, the Court provided two additional rationales--broadcast was uniquely intrusive into the privacy of the home and uniquely accessible to children--which justified relaxed scrutiny and thereby reduced the First Amendment protection accorded to broadcasters. See Pacifica, 438 U.S. at 748-49, 98 S.Ct. at 3039-40. These justifications--spectrum scarcity, intrusiveness, and accessibility to children--neither distinguish broadcast from cable, nor explain the relaxed application of the principles of the First Amendment to broadcast.
 
 A. Spectrum Scarcity
 
 115
 In 1943, the Court determined that the "unique characteristic" of broadcast--that "[u]nlike other modes of expression, radio inherently is not available to all"--explained "why, unlike other modes of expression, it is subject to governmental regulation." National Broadcasting Co., Inc. v. United States, 319 U.S. 190, 226, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943) ("NBC"). Twenty-six years later, the Court spun out the First Amendment implications of this burgeoning scarcity theory. Red Lion, 395 U.S. at 388-90, 89 S.Ct. at 1805-07. The Court first offered an economic scarcity theory,[8] finding that "[w]here there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish."[9] Id. at 388, 89 S.Ct. at 1806. The Court also offered a technological scarcity theory: recognizing the need to prevent "overcrowd[ing of] the spectrum,"[10] id. at 389, 89 S.Ct. at 1806, the Court held that, "[b]ecause of the scarcity of radio frequencies, the Government is permitted to put restraints on licensees in favor of others whose views should be expressed on this unique medium,"[11] id. at 390, 89 S.Ct. at 1806.
 
 
 116
 Although the Supreme Court has not declared the distinction between broadcast and other media a dead one, it has not lately given the distinction an enthusiastic endorsement. In fact, in recent years the Court has only grudgingly upheld the distinction. See, e.g., TBS, --- U.S. at ---- - ----, 114 S.Ct. at 2456-57. On a few occasions, the Supreme Court has acknowledged the mounting criticism against its scarcity rationale. See id. at ----, 114 S.Ct. at 2457 (noting, that "courts and commentators have criticized the scarcity rationale since its inception");[12] League of Women Voters, 468 U.S. at 376-77 n. 11, 104 S.Ct. at 3115-16 n. 11.[13] Nevertheless, to date, the Court has declined to revisit the validity of the scarcity rationale. See TBS, --- U.S. at ----, 114 S.Ct. at 2457 ("[W]e have declined to question its continuing validity as support for our broadcast jurisprudence ... and see no reason to do so here."); League of Women Voters, 468 U.S. at 377 n. 11, 104 S.Ct. at 3116 n. 11 ("We are not prepared, however, to reconsider our longstanding approach without some signal from Congress or the FCC that technological developments have advanced so far that some revision of the system of broadcast regulation may be required.").[14] In my view, it is no longer responsible for courts to apply a reduced level of First Amendment protection for regulations imposed on broadcast based on an indefensible notion of spectrum scarcity. It is time to revisit this rationale.
 
 
 117
 For years, scholars have argued that the scarcity of the broadcast spectrum is neither an accurate technological description of the spectrum, nor a "unique characteristic" that should make any difference in terms of First Amendment protection.[15] First, in response to the problem of broadcast interference when multiple broadcasters attempt to transmit on the same frequency, critics point out that this problem does not distinguish broadcasting from print[16] and is easily remedied with a system of administrative licensing or private property rights.[17] Another problem alluded to by the Court in Red Lion is the claim that the spectrum is inherently limited, in contrast to cable stations or newsprint. Today, however, the nation enjoys a proliferation of broadcast stations,[18] and should the country decide to increase the number of channels, it need only devote more resources toward the development of the electromagnetic spectrum.[19]
 
 
 118
 In response to the economic scarcity argument--that there are more would-be broadcasters than spectrum frequencies available--economists argue that all resources are scarce in the sense that people often would like to use more than exists.[20] Especially when the Government gives away a valuable commodity, such as the right to use certain airwaves free of charge, the demand will likely always exceed the supply.[21] And with the development of cable, spectrum-based communications media now have an abundance of alternatives, essentially rendering the economic scarcity argument superfluous.
 
 
 119
 In short, neither technological nor economic scarcity distinguish broadcast from other media. And while some may argue that spectrum scarcity may justify a system of administrative regulation as opposed to a free market approach to stations,[22] the theory does not justify reduced First Amendment protection.
 
 
 120
 B. Accessibility to Children and Pervasiveness
 
 
 121
 The two additional rationales offered by the plurality opinion in Pacifica, attempting to distinguish broadcasting from other media, also fail to justify limited First Amendment protection of broadcast. The plurality found that "broadcasting is uniquely accessible to children, even those too young to read." Pacifica, 438 U.S. at 749, 98 S.Ct. at 3040.[23] This characteristic, however, fails to distinguish broadcast from cable; and, notably, the rationale is absent from the Court's TBS opinion.
 
 
 122
 The plurality in Pacifica added another rationale which really has two components. The opinion reasoned that "the broadcast media have established a uniquely pervasive presence in the lives of all Americans.... [The] material presented over the airwaves confronts the citizen, not only in public, but also in the privacy of the home."[24] Id. at 748, 98 S.Ct. at 3040. Again, the pervasiveness of its programming hardly distinguishes broadcast from cable. As noted above, cable is pervasive: a majority of television households have cable today, and this percentage has increased every year over the last two decades. See NATIONAL CABLE TELEVISION ASSOCIATION, supra, at 1-A, 2-A. The intrusiveness rationale, that the material confronts the citizen in the privacy of his or her home, likewise, does not distinguish broadcast from cable, nor account for the divergent First Amendment treatment of the two media. Finally, in light of TBS, in which the Court omitted any discussion of these rationales, the Pacifica rationales no longer can be seen to serve as justifications for reduced First Amendment protection afforded to broadcast.
 
 
 123
 It is relevant that Pacifica was a plurality opinion which provided a very limited holding. See 438 U.S. at 750, 98 S.Ct. at 3041 ("It is appropriate ... to emphasize the narrowness of our holding.... The Commission's decision rested entirely on a nuisance rationale under which context is all-important."). The Court has subsequently emphasized that Pacifica's holding was "emphatically narrow," Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 127, 109 S.Ct. 2829, 2837, 106 L.Ed.2d 93 (1989), essentially confirming that Pacifica never was seen to be a seminal statement of constitutional law. But beyond the narrowness of the Court's decision, it seems clear now that Pacifica is a flawed decision, at least when one considers it in light of enlightened economic theory, technological advancements, and subsequent case law. The critical underpinnings of the decision are no longer present. Thus, there is no reason to uphold a distinction between broadcast and cable media pursuant to a bifurcated First Amendment analysis.[25]
 
 
 124
 II. FULL FIRST AMENDMENT PROTECTION OF BROADCAST
 
 
 125
 Because no reasonable basis can be found to distinguish broadcast from cable in terms of the First Amendment protection the two media should receive, I would review section 16(a) and the Enforcement Order under the stricter level of scrutiny courts apply to content-based regulations of cable. This means "the most exacting scrutiny" should be applied "to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." TBS, --- U.S. at ----, 114 S.Ct. at 2459.[26] In Sable, the Court indicated that the "exacting scrutiny" test has two prongs: the Government's interests must be "compelling," and the method of regulation chosen must be "the least restrictive means" to achieve those compelling interests. 492 U.S. at 126, 109 S.Ct. at 2836. That is the essence of the test, I think.
 
 
 126
 In this case, the majority views the broadcast media as disfavored in the application of First Amendment rights, relying principally on Pacifica; however, my colleagues nonetheless agree that section 16(a) reflects a content-based regulation that is subject to exacting scrutiny. Indeed, even the FCC viewed the case in this way. In my view, there is no way that section 16(a) can survive exacting scrutiny.
 
 A. Content-Based Regulations
 
 127
 In explaining the reasons for applying heightened or exacting scrutiny, the Supreme Court recently stated:
 
 
 128
 At the heart of the First Amendment lies the principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence.
 
 
 129
 TBS, --- U.S. at ----, 114 S.Ct. at 2458. This fundamental principle means that "the First Amendment ... does not countenance governmental control over the content of messages expressed by private individuals." Id.[27] Because section 16(a) and the Enforcement Order ban indecent expression,[28] they constitute content-based regulations, which have traditionally raised the red flag of exacting scrutiny. As the Court stated in Sable, "[t]he Government may, however, regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest." 492 U.S. at 126, 109 S.Ct. at 2836. At issue in this case is whether the Government's interests are indeed compelling and whether it has chosen the least restrictive means to further its asserted compelling interests.
 
 
 130
 To withstand constitutional scrutiny, the Government's regulations must serve its interests " 'without unnecessarily interfering with First Amendment freedoms.' " Id. at 126, 109 S.Ct. at 2836 (quoting Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980)). The First Amendment rights at stake here are those of broadcasters and the adult broadcasting audience. The Supreme Court finds laws insufficiently tailored when they deny adults their free speech rights by allowing them to read, watch, or hear only what was acceptable for children. See, e.g., Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 525-26, 1 L.Ed.2d 412 (1957); Sable, 492 U.S. at 127, 109 S.Ct. at 2837 (finding that "this case, like Butler, presents [the Court] with 'legislation not reasonably restricted to the evil with which it is said to deal' ") (quoting Butler, 352 U.S. at 383, 77 S.Ct. at 526).
 
 
 131
 When First Amendment rights are at stake, appellate courts cannot defer to a legislative finding, but must make an independent inquiry to assess whether the record supports the Government's interests. Sable, 492 U.S. at 129, 109 S.Ct. at 2838; Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 843, 98 S.Ct. 1535, 1543-44, 56 L.Ed.2d 1 (1978) (assessing legislative finding or "declaration" that clear and present danger existed). The Court has found this "particularly true where the Legislature has concluded that its product does not violate the First Amendment." Sable, 492 U.S. at 129, 109 S.Ct. at 2838.
 
 B. Compelling Interests
 
 132
 The FCC claims that section 16(a) serves three compelling governmental interests. The ban is meant, first, to support parental supervision of children; second, to promote the well-being of minors; and third, to preserve the privacy of the home. Enforcement Order, 8 F.C.C.R. at 705-06. Only the first two interests are at issue.
 
 
 133
 With respect to the interest in facilitating parental supervision, the Supreme Court has stated that the law has "consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." Ginsberg v. New York, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968). It is entirely reasonable for "[t]he legislature [to] properly conclude that parents and others ... who have this primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." Id. Similarly, with respect to the Commission's second interest, protecting the well-being of its youth, the Court on numerous occasions has found "a compelling interest in protecting the physical and psychological well-being of minors." Sable, 492 U.S. at 126, 109 S.Ct. at 2836; see also Pacifica, 438 U.S. at 749, 98 S.Ct. at 3040; Ginsberg, 390 U.S. at 640, 88 S.Ct. at 1281. But to note that these interests are compelling in the abstract is not to scrutinize the Government's assertions as applied to this case.
 
 
 134
 As I discussed in the panel decision, Action for Children's Television v. FCC, 11 F.3d 170, 183-86 (D.C.Cir.1993) (Edwards, J., concurring), one of the most significant problems with the Government's defense of its regulations is that its first two asserted interests, at least as the FCC appears to define their scope here, are irreconcilably in conflict. The Commission cannot simultaneously seek to facilitate parental supervision over their children's exposure to indecent programming and at the same time protect all children from indecent speech by imposing a flat ban on indecent programming from the hours of 6 a.m. to midnight. Simply put, among the myriad of American parents, not every parent will decide, as the Commission has, that the best way to raise its child is to have the Government shield children under eighteen from indecent broadcasts. Furthermore, not every parent will agree with the Commission's definition of indecency, nor whether it is appropriate in some contexts, nor at what age their own children may be exposed to such programming. In asserting both interests--facilitating parental supervision and protecting children from indecent broadcast--the Government must assume not only that parents agree with the Commission, but that parents supervise their children in some uniform manner. Surely, this is not the case. When acting consciously, some parents may prohibit their children from any exposure to indecent material; some may impose a modified prohibition depending upon the content of the programming and the child's maturity; still others may view or listen to indecent material with their children, either to criticize, endorse, or remain neutral about what they see or hear. A complete ban on indecent broadcasts does not facilitate the variety of American parents in supervising their children's exposure to broadcasting.
 
 
 135
 The Commission maintains that these two interests bolster and reinforce each other. Tr. of Oral Argument at 56. It contends that "it simply is not practical for these parents to control effectively what their children might see and hear on the broadcast medium." Brief for Respondents at 16. But here, the Commission assumes that parents are unavailable or inept at the task of parenting, and essentially establishes itself as the final arbiter of what broadcast American children may see and hear. In so doing, the Government tramples heedlessly on parents' rights to rear their children as they see fit and to inculcate them with their own moral values.[29] Courts generally do not take these moves lightly. We have long recognized the rights of parents to raise their children in the manner they see fit. See, e.g., Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925) (striking state law requiring children to attend public schools as "interfer[ing] with the liberty of parents and guardians to direct the upbringing and education of children under their control"); Meyer v. Nebraska, 262 U.S. 390, 401, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923) (striking state law that prohibited teaching foreign languages to children as interfering with "the power of parents to control the education of their own"). As the Supreme Court said in Ginsberg, "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." 390 U.S. at 639, 88 S.Ct. at 1280; see also Wisconsin v. Yoder, 406 U.S. 205, 213-36, 92 S.Ct. 1526, 1532-44, 32 L.Ed.2d 15 (1972) (exempting children of Amish faith from compulsory school attendance law on grounds that it impinges on other fundamental rights such as traditional interest of parents with respect to religious upbringing of their children). When the Government does intervene in the rearing of children contrary to parents' preferences, it is usually in response to some significant breakdown within the family unit or in the complete absence of parental caretaking. Society protects children who are abused, neglected, or abandoned, because the harm is clear and such actions are contrary to civilized notions of parenting. The Government does not generally tell parents what speech their children should and should not hear absent some showing of harm to their children.
 
 
 136
 In other contexts, these two interests--facilitating parental supervision and protecting children from indecency--may have worked in tandem. For example, in Pacifica, a father's complaint that his son heard an indecent monologue prompted the FCC to enforce sanctions. Pacifica, 438 U.S. at 729-33, 98 S.Ct. at 3030-32. In that case, facilitating parental control and protecting the well-being of minors might have simultaneously converged; the parent agreed with the Commission (or vice versa). In Ginsberg, the statute only prohibited selling obscene magazines to minors; it did not prohibit the selling of obscene magazines to everyone. 390 U.S. at 634-35, 88 S.Ct. at 1277-1278. Again, this statute may be viewed as facilitating parental control while simultaneously protecting children from indecency. Indeed, the Court explicitly recognized that "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." Id. at 639, 88 S.Ct. at 1280 (citing Louis Henkin, Morals and the Constitution: The Sin of Obscenity, 63 COL.L.REV. 391, 413 n. 68 (1963) (noting that "one can well distinguish laws which do not impose a morality on children, but which support the right of parents to deal with the morals of their children as they see fit")). The instant case, however, differs from those two; this ban removes indecent speech from the broadcast airwaves beyond the reach of adults and parents, essentially mandating the Commission's desired result. Once it becomes clear that, in this context, these two interests conflict, it is then important to determine which compelling interest takes precedence.
 
 
 137
 The FCC asserts that its primary interest is in facilitating parental supervision. See Tr. of Oral Argument at 55 (counsel for FCC stating "[w]e consistently stated that the primary interest is in aiding parents in supervising children"). The Commission is wise to assert its interest in facilitating parents as its primary interest, for this surely offers a firmer base for permissible regulation. As the Supreme Court stated in Ginsberg.
 
 
 138
 [i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.
 
 
 139
 390 U.S. at 639, 88 S.Ct. at 1280 (quoting Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944)).
 
 
 140
 However, if facilitating parental supervision means allowing parents to run the household in the manner they choose, then the FCC has preempted, not facilitated, parental control in enforcing section 16(a). While the Government's interest in protecting the well-being of children is undoubtedly compelling, when it conflicts with parental preferences and arguably treads on First Amendment rights, case law requires the Government to show some evidence of harm. It is easy to assume that there must be ill effects from exposing children, and especially young ones, to indecent material, but Supreme Court doctrine suggests that we must check our assumptions. And with respect to exposure to broadcast indecency and the impact on children, we have yet to unearth any ill effects.
 
 
 141
 The Supreme Court has not established what is required in terms of a showing of harm from exposure to indecency. Although harm was not at issue in Pacifica, one can read the plurality opinion there as assuming that the indecent monologue harmed children. Recent Supreme Court case law, however, suggests that more is required. In TBS, a plurality of the Court found that, while "the Government's asserted interests are important in the abstract," this did not mean that the regulations at issue in that case "in fact advance those interests." --- U.S. at ----, 114 S.Ct. at 2470. It continued, "[w]hen the Government defends a regulation on speech as a means to ... prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' " Id. (quoting Quincy Cable TV, Inc. v. FCC, 768 F.2d 1434, 1455 (D.C.Cir.1985)). The Court was clear about the burdens on the Government: "It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Id. (citing Edenfield v. Fane, --- U.S. ----, ---- - ----, 113 S.Ct. 1792, 1798-99, 123 L.Ed.2d 543 (1993)); see also City of Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 496, 106 S.Ct. 2034, 2038, 90 L.Ed.2d 480 (1986) ("[T]his Court 'may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity.' " (quoting City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 803 n. 22, 104 S.Ct. 2118, 2127 n. 22, 80 L.Ed.2d 772 (1984))); Home Box Office, Inc. v. FCC, 567 F.2d 9, 36 (D.C.Cir.1977) ("[A] regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist." (internal quotations omitted)). While the Court in TBS noted that Congress's predictive judgments are entitled to substantial deference, and that Congress is not required to make a record of the type an agency must make, it stressed that Congress's judgments are not insulated from "meaningful judicial review." --- U.S. at ----, 114 S.Ct. at 2471 (plurality). "On the contrary," the Court stated "we have stressed in First Amendment cases that the deference afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.' " Id. (quoting Sable, 492 U.S. at 129, 109 S.Ct. at 2838).
 
 
 142
 In Edenfield, the Court struck down a state law prohibiting certified public accountants ("CPAs") from engaging in direct, in-person, uninvited solicitation. --- U.S. at ---- - ----, 113 S.Ct. at 1798-1804. The Court held that, under the intermediate scrutiny prescribed for commercial speech under its decision in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), a party seeking to uphold a restriction on speech carries the burden of justifying it which "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Edenfield, --- U.S. at ----, 113 S.Ct. at 1800; see also League of Women Voters, 468 U.S. at 391, 104 S.Ct. at 3123 (finding that interest asserted by Government is not substantially advanced by statutory scheme, in part because risk that Government would seek to influence or pressure local stations was "speculative at best"). In Edenfield, the Court found that the state Board of Accountancy failed to present any studies that suggested that personal solicitation of prospective business clients by CPAs creates the dangers of fraud, overreaching, or compromised independence, the prevention of which the Board claimed as its interest. --- U.S. at ----, 113 S.Ct. at 1800. The Court noted that the only suggestion that the prevention of these evils was served by the ban was found in an affidavit containing conclusory statements. Id. at ----, 113 S.Ct. at 1801. The evidence offered by the Commission in this case is no better.[30]
 
 
 143
 In contending that the Government must protect children's well being, the Commission makes two arguments: first, it asserts that it may assume that indecent broadcast material harms children as a matter of law, citing Pacifica and Ginsberg; and, second, it suggests that the congressional sponsors considered evidence of the negative effects of television on young viewers. Enforcement Order, 8 F.C.C.R. at 706-07. The Commission's reliance on Pacifica does not help its case; the question of harm was not before that Court, and, as discussed earlier, the interest in the protection of children was not necessarily at odds with the interest in facilitating parental supervision in that case. Contrary to the Commission's assertion, the Court in Ginsberg did not presume harm as a matter of law. Rather, the Court struggled with the question of whether the legislature had shown evidence of a causal link between "obscenity" and "impairing the ethical and moral development" of youth. 390 U.S. at 641-42, 88 S.Ct. at 1282. Under rationality review, the Court found that it could not state that the statute's regulation of obscenity had "no rational relation to the objective of safeguarding such minors from harm."[31] Id. at 643, 88 S.Ct. at 1282. In this case, the court is not reviewing regulations that deal with obscenity, nor is the court operating under rationality review.
 
 
 144
 The congressional sponsors do not offer any evidence of a link between exposure to indecency and harm to children. Five out of the eight articles cited address materials involving violence, not indecency,[32] and the remaining three discuss sexual materials but do not account for any harm.[33] There simply is no evidence that indecent broadcasts harm children, the absence of which stands in striking contrast, to the wealth of research conducted on the harmful effects of televised violence.[34] In oral argument, counsel for the Commission was unable to cite to any study that found a causal connection between exposure to indecent broadcast and psychological or other harm to children. Tr. of Oral Argument at 47-51. The Government has failed to be mindful of recent Supreme Court decisions, such as TBS and Edenfield, requiring the showing of evidence before asserting that its restrictions on speech will alleviate real harms. Where the interest of protecting children conflicts with parental preferences, and where this interest is asserted with no evidence of harm, it cannot withstand exacting scrutiny. Accordingly, the only interest the Commission asserts which is indeed compelling in this context is facilitating parental supervision.
 
 C. Least Restrictive Means
 
 145
 It would be hard to object to some sort of regulation of indecency in broadcast as well as other media were it narrowly tailored to facilitate parental supervision of children's exposure to indecent material. But that is not what the Government has offered. As the Supreme Court has stated, "[i]t is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." Sable, 492 U.S. at 126, 109 S.Ct. at 2837. The Government's chosen means, a ban on indecent speech from the hours of 6 a.m. to midnight (or until 10 p.m., the court-enforced zone), is not the least restrictive means to facilitate parental supervision.
 
 
 146
 Although unlikely, it is conceivable that such a ban on indecent programming could be the least restrictive means of facilitating parental control. For example, the Government might show that significant numbers of unsupervised children were watching or listening to programs containing indecency during the hours of the ban, that parents wished to limit what their children saw or heard, and that other means of controlling such exposure was considered and found to be ineffective. In this case, the Government offers no data on actual parental supervision, parental preferences, or on the effectiveness of parental supervision at different hours of the day and night. The Commission presents no program-specific data of what children watch, despite the existence of this data. See Tr. of Oral Argument at 46 (in response to the court's question, concerning whether more reliable data was available--"Could the Commission collect specific data about the number of children in the audience of particular programs or particular stations by age?"--Counsel for the FCC replied, "[i]t is available and advertisers rely on it"). Without this kind of data, the Commission's decision to ban indecent broadcasting during the extensive period here in question is not narrowly tailored to serve the asserted interest of facilitating parental supervision.
 
 
 147
 More telling perhaps than the lack of data on parental supervision and the programming children watch, is the lack of any consideration of other less speech-restrictive means in the Enforcement Order. The Commission simply asserted:
 
 
 148
 the broadcast indecency channeling program ... most effectively serves the compelling interest of protecting children from exposure to indecent broadcast material without intruding excessively on the rights of those entitled to present or receive such material. We therefore believe that the means chosen is the least restrictive available for the broadcast medium and that other alternatives cannot effectively further this interest.
 
 
 149
 8 F.C.C.R. 711. To what other alternatives is the Commission referring? Absent from the Commission's decision is any discussion of an alternative method. And yet, at oral argument, counsel for the FCC assured the court that blocking technology, in which a chip placed in television sets prevents certain shows from being transmitted, is available. See Tr. of Oral Argument at 62. This device actually facilitates parental supervision in allowing parents to choose what programs or stations to block; and it is undoubtedly less speech-restrictive since parents assume control.[35] In the Alliance case heard on the same day as this one, the Commission presented another alternative, a segregate-and-scramble scheme of indecent programming on cable's leased access channels. Again, while this may not be the best means, surely "exacting scrutiny" requires some consideration of alternatives before finding that the means chosen is the least restrictive available. The Commission's Enforcement Order shows no consideration of alternatives when they clearly exist. Therefore, the Commission's ban on indecent broadcast cannot be seen as the least restrictive means to facilitate parental control.
 
 
 150
 In summary, the Government's ban on indecent speech is not the least restrictive means available to further the Commission's primary compelling interest of facilitating parental supervision of their children's exposure to indecent programming.[36] The Commission has failed to show that its secondary interest, protecting children from exposure to indecent broadcast, is compelling when it conflicts with the rights of parents to rear their children in the way they see fit and when it is advanced with no evidence of harm. In applying the same level of scrutiny to regulations of broadcast as we do to regulations of cable and other media, it seems clear that section 16(a) and the Enforcement Order violate the First Amendment.
 
 III. CONCLUSION
 
 151
 The Constitution prohibits the Government from infringing on the free speech rights of its citizens without showing that a content-based regulation is the least restrictive means to further compelling interests. The Government's ban on indecent speech fails to pass exacting scrutiny. I would vacate the FCC's Enforcement Order and hold section 16(a) of the Public Telecommunications Act of 1992 unconstitutional.
 
 
 152
 WALD, Circuit Judge, with whom ROGERS and TATEL, Circuit Judges, join, dissenting:
 
 
 153
 "At the heart of the First Amendment lies the principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal." Turner Broadcasting System, Inc. v. FCC, --- U.S. ----, ----, 114 S.Ct. 2445, 2458, 129 L.Ed.2d 497 (1994). Very often this principle is not such an easy one to live up to or to live with. But presumptively, expression that many or even most of us find deeply reprehensible may not be, on that basis alone, proscribed. In R.A.V. v. City of St. Paul, 505 U.S. 377, ----, 112 S.Ct. 2538, 2550, 120 L.Ed.2d 305 (1992), for instance, the Court held that racist fighting words could not be penalized on the basis of the hatred they expressed. Thus, whatever our collective interests in a "meritorious polity" and the moral development of the "people [who] govern it," Majority Opinion ("Maj. op.") at 103, governmental enforcement of those interests is radically constrained by the First Amendment's guarantee of freedom of expression.
 
 
 154
 This principle of free speech admits of limited exceptions, one of which is the permissibility of some government regulation of broadcast indecency. In FCC v. Pacifica Foundation, 438 U.S. 726, 729, 750-51, 98 S.Ct. 3026, 3030, 3039-41, 57 L.Ed.2d 1073 (1978), for example, the Supreme Court concluded that the Federal Communications Commission could constitutionally penalize the daytime broadcast of a dialogue containing the repeated use of "filthy words." As Chief Judge Edwards notes, Pacifica's result rested in large part on technological assumptions about the uniqueness of broadcast that have changed significantly in recent years, and the time may be ripe for the Court to recognize those changes by reevaluating its decision in that case. I believe, however, that the "safe harbor" proposed by the government here is unconstitutional even if the Court does not reconsider Pacifica.
 
 
 155
 Because indecent speech is fully within the ambit of First Amendment protection, the permissibility of government regulation of indecency depends crucially on the distinction between banning and channelling speech. Even Pacifica did not, by any stretch of the imagination, grant the government discretion to censor broadcast indecency however it pleased. Rather, Pacifica was "an emphatically narrow holding," Sable Communications v. FCC, 492 U.S. 115, 127, 109 S.Ct. 2829, 2837, 106 L.Ed.2d 93 (1989), addressed solely to the Commission's single enforcement decision on review in that case and with the understanding that the Commission " 'never intended to place an absolute prohibition on the broadcast of this type of language, but rather sought to channel it to times of day when children most likely would not be exposed to it.' " Pacifica, 438 U.S. at 733, 98 S.Ct. at 3032. In keeping with this emphasis on channelling, the Court noted in Sable that the "most obvious [ ]"--and salient--distinction between the telephone indecency ban at issue in that case and in Pacifica was that Pacifica "did not involve a total ban on broadcasting indecent material." 492 U.S. at 127, 109 S.Ct. at 2837. As this court has held, an outright ban on broadcast indecency is unconstitutional. See Action for Children's Television v. FCC, 932 F.2d 1504, 1509 (D.C.Cir.1991) ("ACT II "); see also Alliance for Community Media v. FCC, 56 F.3d 105 (D.C.Cir.1995) ("If decisions of cable operators not to carry indecent programs ... were treated as decisions of the government, the Commission and the United States would be hard put to defend the constitutionality of these provisions.").
 
 
 156
 Because the channelling of indecency effectuates a very delicate balance between the uncontestable First Amendment rights of adult viewers and the interests of parents (or society) in protecting immature children from indecent material--interests I discuss at greater length below--the design of the channelling is of utmost constitutional import. This the majority recognizes, in theory if not in fact: "The question, then, is what period will serve the compelling governmental interests without unduly infringing on the adult population's right to see and hear indecent material." Maj. op. at 105 (emphasis added); see also Alliance for Community Media v. FCC, 56 F.3d at 124 ("[I]n fashioning such a regulation, the government must strive to accommodate at least two competing interests: the interest in limiting children's exposure to indecency and the interest of adults in having access to such material."); id., dissenting op. of Judge Wald at 16 ("[A] regulation can be the most effective means of achieving a compelling interest and still run afoul of the First Amendment if it burdens substantial amounts of protected speech beyond what would be reasonably effective in serving the compelling interest.").
 
 
 157
 Thus, although the use of channelling as a regulatory tool is a distinct and largely uncharted area of First Amendment law, the majority and I are in agreement that its precision and care hold the constitutional passkey to permissible regulation. Like any content-based restriction on speech, the regulation of broadcast indecency must be narrowly tailored to a compelling government interest and it must avoid undue "infringe[ment] on the adult population's right to see and hear indecent material." Maj. op. at 105.
 
 
 158
 It is in implementing this balance that I part decisively with the majority. Any time-based ban on the airing of indecency intrudes substantially into the rights of adult viewers and listeners and places the government in the extraordinarily sensitive role of censor. By now, at least in the posture of the current case, it is probably too late to revisit our conclusion that the chill brought about by the Commission's open-textured definition of indecency is insufficiently great to invalidate the regulation. See Action for Children's Television v. FCC, 852 F.2d 1332, 1338-40 (D.C.Cir.1988) ("ACT I "). Even a cursory glance at the Commission's enforcement policy to date, however, suggests that that chill is quite substantial, heightening the need for a meaningful safe harbor.[1]
 
 
 159
 Because the Commission insists that indecency determinations must be made on a case-by-case basis and depend upon a multi-faceted consideration of the context of allegedly indecent material, broadcasters have next-to-no guidance in making complex judgment calls. Even an all clear signal in one case cannot be relied upon by broadcasters "unless both the substance of the material they aired and the context in which it was aired were substantially similar." Sagittarius Broadcasting Corp., Notice of Apparent Liability, 7 F.C.C.R. 6873, 6874 (1992). Thus, conscientious broadcasters and radio and television hosts seeking to steer clear of indecency face the herculean task of predicting on the basis of a series of hazy case-by-case determinations by the Commission which side of the line their program will fall on. When, for instance, radio station hosts read over the air from a Playboy Magazine interview of Jessica Hahn about her alleged rape by the Reverend Jim Bakker, they did not regard the material as indecent because it involved matters of obvious public concern. The Commission, however, issued a notice of apparent liability for a forfeiture of $2,000, explaining that, "while the newsworthy nature of broadcast material and its presentation in a serious, newsworthy manner would be relevant contextual considerations in an indecency determination, they are not, in themselves, dispositive factors." KSD-FM, Notice of Apparent Liability, 6 F.C.C.R. 3689, 3689 (1990). Newsworthiness, the Commission explained, is "simply one of many variables"; no single feature renders a work per se not indecent. Id. Although in reading the interview, the hosts had said that the account made them "sick," that it described rape rather than consensual sex, and that they regretted their earlier jokes about the incident, the Commission concluded, without elaboration, that the presentation was "pandering." Id. at 3689-90. As this one case exemplifies so well, in enforcing the indecency regulations the Commission takes upon itself a delicate and inevitably subjective role of drawing fine lines between "serious" and "pandering" presentations. And even a "serious" presentation of newsworthy material is emphatically not shielded from liability. This incident and the Commission's discussion of it suggests that enforcement of its indecency regulation involves both government- and self-censorship of much material that presents far harder choices than the glaring examples of smut emphasized to such rhetorical effect by the majority. Maj. op. at 97, 100.
 
 
 160
 Because of this potential for significant incursion into the First Amendment rights of adult viewers and listeners during the hours of the day and evening when the ban is in effect, it is particularly important that the channelling "balance" struck by the government preserve a meaningful place on the spectrum for adult rights to hear and view controversial or graphic nonobscene material--that airing of such material not be restricted to a safe harbor that is in reality a ship's graveyard. Thus, I cannot agree with the majority that determining the perimeter of the safe harbor can be relegated to the category of discretionary line-drawing akin to the distance from polls at which electioneering is allowed and so largely shielded from judicial review. Maj. op. at 667. God or the Devil (pick your figure of speech) is in the details. Because the safe harbor constitutes the exclusive repository for the substantial First Amendment rights of adults, its boundaries are of "constitutional dimension." Cf. Burson v. Freeman, 504 U.S. 191, 210, 112 S.Ct. 1846, 1857, 119 L.Ed.2d 5 (1992). For that reason, it cannot be beyond the competence of this court to ensure that the safe harbor ensures meaningful as opposed to pro forma accommodation of adult rights.
 
 
 161
 On the basis of the information given us by the Commission and that was before Congress, it is impossible to conclude that the midnight to 6 a.m. safe harbor strikes a constitutionally acceptable balance. Recent Supreme Court cases have made clear that "[w]hen the Government defends a regulation on speech as a means to ... prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Turner, --- U.S. at ----, 114 S.Ct. at 2470 (internal quotations omitted). In light of so exacting a standard, one must, from the very outset, entertain grave misgivings about the designation of the midnight to 6 a.m. boundaries.[2] Without a clear exposition of the scope of the government's interest, we cannot know whether its means are tailored to be the least restrictive available. See Edenfield v. Fane, --- U.S. ----, ----, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (1993) ("the extent of the restriction on protected speech [must be] in reasonable proportion to the interests served"). Yet, in the record before Congress, there is as little evidence regarding the magnitude of psychological or moral harm, if any, to children and teenagers who see and hear indecency as there is that such exposure even occurs inside the current safe harbor. In the six years that the safe harbor has been operating from 8 p.m. to 6 a.m., and the prior years in which it covered 10 p.m. to 6 a.m., the government has adduced no concrete evidence of real or even potential harm suffered by the exposure of children to indecent material. We have not a scintilla of evidence as to how many allegedly indecent programs have been either aired or seen or heard by children inside or outside the safe harbor. Thus, even if the government were allowed to presume harm from mere exposure to indecency, surely it cannot progressively constrict the safe harbor in the absence of any indication that the presumed harm is even occurring under the existing regime.
 
 
 162
 Even if the government were acting on a tabula rasa, rather than on the basis of years of experience with a less restrictive ban, its delineation of the midnight to 6 a.m. safe harbor would be unjustifiable. I agree with Chief Judge Edwards that the primary government interest here must be in facilitating parental supervision of children. Although the Supreme Court has recognized the government's own interest in protecting children from exposure to indecency, it has never identified this interest as one that could supersede the parental interest. The government's protective responsibility in a matter of morals is, as the majority recognizes, "complementary" to that of parents. Maj. op. at 103. Thus, although the majority speaks broadly of the government's independent interest in shielding children from indecency, Maj. op. at 101-102, it recognizes--as it must--that this interest is circumscribed; absent neglect or abuse, it cannot rise above the parental interest in childrearing. Maj. op. at 103 (parents who wish may expose their children to indecency). In the end, the majority admits the government's own interest in children is limited to "shielding minors from being exposed to indecent speech by persons other than a parent." Maj. op. at 103.
 
 
 163
 The majority is right: the government's primary if not exclusive interest is in "shielding minors from being exposed to indecent speech by persons other than a parent." Given the significant First Amendment rights of adults at stake, moreover, the government has a constitutional responsibility to key its response to the presumed harm from indecency to facilitating parental control, rather than to government censorship per se. When most parents are presumably able to supervise their children, adult viewers should have access to the speech to which they are entitled. See Pacifica Foundation v. FCC, 556 F.2d 9, 36 (D.C.Cir.1977) (Leventhal, J., dissenting) ("A ruling expanding the zone of the broadcastable to adult levels might apply when the time of broadcast is such that the great preponderance of children are subject to parental control.").
 
 
 164
 Because the government can pursue whatever legitimate interests it has in protecting children by facilitating parental control, I do not believe that it can impose a valid ban during any hours it pleases solely because some children are in the audience. Nor do I believe that we can throw up our hands at the assumed impossibility of parental supervision simply because large numbers of children have television sets in their own room. Either or both of these excuses would justify a 24-hour ban as easily as the current 18-hour ban. Reasoning along these lines totally ignores the adult First Amendment interest that the majority purportedly recognizes and, effectively, gives the government unharnessed power to censor.
 
 
 165
 Instead, the scope of any safe harbor can only be responsibly justified in the terms that the government emphasized at oral argument. Counsel for the government maintained that its primary interest is in assisting parents to control their children's viewing and that the function of a safe harbor is to support this interest by identifying for parents a reasonable time period during which they must exert their supervisory function.[3] A safe harbor, so tailored, may well be a constitutionally acceptable means of furthering society's interest in protecting children.[4] Advancement of this justification, however, requires careful tailoring of a sort completely neglected by the government. Though it may be entirely logical for the government to assist parents by purging the airwaves of indecency during certain hours when parental supervision typically is at a low ebb, the government should be put to the task of demonstrating that the banned hours are based on a showing that these are the times of preponderant children viewing and the times when parents are otherwise absorbed in work in or out of the home. As the initial panel opinion explained, "[t]he Commission[ ] ... appears to assume that, regardless of the time of day or night, parents cannot effectively supervise their children's television or radio habits. Accordingly, the government has not adduced any evidence suggesting that the effectiveness of parental supervision varies by time of day or night, or that the particular safe harbor from midnight to 6 a.m. was crafted to assist parents at specific times when they especially require the government's help to supervise their children." Action for Children's Television v. FCC, 11 F.3d 170, 178 (D.C.Cir.1993) ("ACT III ").
 
 
 166
 In constructing a safe harbor the government needs to give more careful consideration to those hours in the evening when parental control could reasonably be relied upon in lieu of censorship to protect children. It is only in this manner that the government can genuinely strike the delicate balance between adult freedoms of expression and society's interest in shielding children from indecency and a truly safe harbor can be crafted that "serve[s] the compelling governmental interests without unduly infringing on the adult population's right to see and hear indecent material." Maj. op. at 105.
 
 
 167
 Despite the majority's valiant effort to extract evidence for the government's position from the sparse record before us, the pickings are too slim for constitutional legitimacy. See Turner, --- U.S. at ----, ----, 114 S.Ct. at 2470, 2471 (rejecting record that included "unusually detailed statutory findings," id. at ----, 114 S.Ct. at 2461, as insufficiently detailed to survive intermediate scrutiny under the First Amendment). There is no evidence at all of psychological harm from exposure to indecent programs aired inside the current safe harbor. There is no evidence either that parents cannot supervise their children in those safe harbor hours or that "grazing" is leading to any significant viewing of indecency.[5] Finally, the imminence of "V-chip" technology to enable parental control of all violence- and indecency-viewing suggests that a draconian ban from 6 a.m. to midnight is decidedly premature.
 
 
 168
 In spite of this evidentiary black hole, we have a broadside ban on vaguely defined indecency during all hours when most working people are awake, with a small bow to prior judicial rulings that a complete ban is unconstitutional, but no attempt to fashion an accommodation between the First Amendment and family values. The net effect of the majority's decision is a gratuitous grant of power allowing casual and lightly reviewed administrative decisionmaking about fundamental liberties. I respectfully dissent.
 
 
 
 [1]
 At issue is the Public Telecommunications Act of 1992, Pub.L. No. 102-356, Sec. 16(a), 106 Stat. 949, 954 (1992) ("section 16(a)"). Section 16(a) of Act provides:
 FCC Regulations--The Federal Communications Commission shall promulgate regulations to prohibit the broadcasting of indecent programming--
 (1) between 6 a.m. and 10 p.m. on any day by any public radio station or public television station that goes off the air at or before 12 midnight; and
 (2) between 6 a.m. and 12 midnight on any day for any radio or television broadcasting station not described in paragraph (1).
 The regulations required under this subsection shall be promulgated in accordance with section 553 of title 5, United States Code, and shall become final not later than 180 days after the date of enactment of this Act [Aug. 26, 1992].
 47 U.S.C. Sec. 303 note (Supp. IV 1992).
 Section 16(a) was enforced by the Federal Communications Commission in 1993. In the Matter of Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. Sec. 1464: Report and Order, 8 F.C.C.R. 704, 711 (1993) ("Enforcement Order").
 Although the majority finds the 6 a.m. to midnight ban is narrowly tailored to serve a compelling state interest, it holds that section 16(a) is unconstitutional insofar as it bars the broadcasting of indecent speech between the hours of 10 p.m. and midnight. The majority reaches this conclusion because "Congress has failed to explain what, if any, relationship the disparate treatment accorded certain public stations bears to the compelling Government interest--or to any legislative value--that Congress sought to advance when it enacted section 16(a)."
 The "public broadcaster exception" is an aside to the real issue in this case. Indeed, in holding that the 6 a.m. to midnight ban is constitutional, the majority appears to invite Congress to extend the 6 a.m. to midnight ban to all broadcasters, without exception. Therefore, in my view, the majority's treatment of this issue in no way deflects from its principal holding that "the midnight to 6:00 a.m. safe harbor is narrowly tailored to serve the Government's compelling interest in the well-being of our youth." It is this holding that will be the focus of this dissent.
 
 
 [2]
 See, e.g., ALBERT BANDURA, AGGRESSION: A SOCIAL LEARNING ANALYSIS 72-76 (1973); WILLIAM A. BELSON, TELEVISION VIOLENCE AND THE ADOLESCENT BOY (1978); GEORGE COMSTOCK, THE EVOLUTION OF AMERICAN TELEVISION 159-238 (1989); MONROE M. LEFKOWITZ ET AL., GROWING UP TO BE VIOLENT: A LONGITUDINAL STUDY OF THE DEVELOPMENT OF AGGRESSION (1977); L. Rowell Huesmann et al., The Effects of Television Violence on Aggression: A Reply to a Skeptic, in PSYCHOLOGY AND SOCIAL POLICY 191 (Peter Suedfeld & Philip E. Tetlock eds., 1992); David Pearl, Familial, Peer, and Television Influences on Aggressive and Violent Behavior, in CHILDHOOD AGGRESSION AND VIOLENCE: SOURCES OF INFLUENCE, PREVENTION, AND CONTROL 231, 236-37 (David H. Crowell et al. eds., 1987)
 
 
 [3]
 Alliance for Community Media involved the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102-385, Sec. 10, 106 Stat. 1460, 1468 (1992) and In the Matter of Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992, 8 F.C.C.R. 2638 (1993), which included a segregate-and-block scheme
 
 
 [4]
 Approximately 59 million households have cable television. RESEARCH & POLICY ANALYSIS DEPARTMENT, NATIONAL CABLE TELEVISION ASSOCIATION, CABLE TELEVISION DEVELOPMENTS: INDUSTRY OVERVIEW, Fall 1994, at 1-A (citing A.C. Nielsen Co. & Paul Kagan Associates, Inc., Marketing New Media, June 20, 1994); see also Alliance for Community Media, 56 F.3d at 124-25 (citing H.R.CONF.REP. NO. 862, 102d Cong., 2d Sess. 56 (1992) (noting that more than sixty percent of all households with television, subscribe to cable)); id. (citing S.REP. NO. 92, 102d Cong., 2d Sess. 3 (1991) U.S.Code Cong. & Admin.News 1992, pp. 1133, 1135, 1238 (noting that "[c]able television has become our Nation's dominant video distribution medium"))
 
 
 [5]
 In 1975, the percentage of television households with cable was 13%; in 1985, the percentage was 45%; and in 1994, estimations suggest between 62% and 63% of television households have cable. NATIONAL CABLE TELEVISION ASSOCIATION, at 1-A, 2-A
 
 
 [6]
 "Compare Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (television), and National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (radio), with Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (print), and Riley v. National Fed'n of Blind of N.C., Inc., 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (personal solicitation)." TBS, --- U.S. at ----, 114 S.Ct. at 2456 (parallel citations omitted)
 
 
 [7]
 In beginning their analysis of content-based regulations of broadcast, Court opinions often cite to the now-familiar quotation from Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952): "Each method [of expression] tends to present its own peculiar problems." See, e.g. Pacifica, 438 U.S. at 748, 98 S.Ct. at 3039-40; Red Lion Broadcasting Co., Inc. v. FCC, 395 U.S. 367, 386-87, 89 S.Ct. 1794, 1804-05, 23 L.Ed.2d 371 (1969); League of Women Voters, 468 U.S. at 377, 104 S.Ct. at 3106. In fact, these opinions seem to attribute more to the Court's statement in Joseph Burstyn than appears warranted. Compare Joseph Burstyn, 343 U.S. at 503, 72 S.Ct. at 781 ("Each method tends to present its own peculiar problems.") with Pacifica, 438 U.S. at 748, 98 S.Ct. at 3039 ("We have long recognized that each medium of expression presents special First Amendment problems." (citing Joseph Burstyn, 343 U.S. at 502-03, 72 S.Ct. at 780-81)) and Red Lion, 395 U.S. at 386-87, 89 S.Ct. at 1805 ("[D]ifferences in the characteristics of new media justify differences in the First Amendment standards applied to them." (citing Joseph Burstyn, 343 U.S. at 503, 72 S.Ct. at 781))
 More glaringly, these opinions fail to quote the sentence that follows. In Joseph Burstyn, the Supreme Court struck down a law which forbade the showing of any motion-picture film without a license, that could be withheld if a censor found the film sacrilegious. In determining that motion pictures were within the protection of the First Amendment, the Court stated: "Each method tends to present its own peculiar problems. But the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary." 343 U.S. at 503, 72 S.Ct. at 781 (emphasis added). Certainly with respect to broadcast and cable, the peculiar problems or differences between the two media do not justify different levels of First Amendment protection.
 
 
 [8]
 Interestingly, in responding to Government's argument that cable and broadcast are alike in that they both are beset by "market dysfunction," the TBS Court stated that "the special physical characteristics of broadcast transmission, not the economic characteristics of the broadcast market, are what underlies our broadcast jurisprudence." --- U.S. at ----, 114 S.Ct. at 2457 (citations omitted). Apparently, the Court is now prepared to abandon the economic scarcity theory
 
 
 [9]
 The scarcity theory justifying regulation of broadcast was hinged in part on a public trust notion: "those who are granted a license to broadcast must serve in a sense as fiduciaries for the public." League of Women Voters, 468 U.S. at 377, 104 S.Ct. at 3116
 
 
 [10]
 The Court recently restated this concern: "if two broadcasters were to attempt to transmit over the same frequency in the same locale, they would interfere with one another's signals, so that neither could be heard at all." TBS, --- U.S. at ----, 114 S.Ct. at 2456 (citing NBC, 319 U.S. at 212, 63 S.Ct. at 1007-08)
 
 
 [11]
 See also TBS, --- U.S. at ----, 114 S.Ct. at 2457 (noting that spectrum scarcity "has been thought to require some adjustment in traditional First Amendment analysis to permit the Government to place limited content restraints, and impose certain affirmative obligations, on broadcast licensees" (citing Red Lion, 395 U.S. at 390, 89 S.Ct. at 1806-07)); League of Women Voters, 468 U.S. at 377, 104 S.Ct. at 3116 ("The fundamental distinguishing characteristic of the new medium of broadcasting that, in our view, has required some adjustment in First Amendment analysis is that '[b]roadcast frequencies are a scarce resource [that] must be portioned out among applicants.' " (quoting Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 101, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973)))
 
 
 [12]
 In TBS, --- U.S. at ---- n. 5, 114 S.Ct. at 2457 n. 5, the Court cited some of those courts and commentators: Telecommunications Research & Action Ctr. v. FCC, 801 F.2d 501, 508-09 (D.C.Cir.1986), cert. denied, 482 U.S. 919, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987); LEE BOLLINGER, IMAGES OF A FREE PRESS 87-90 (1991); LUCAS POWE, AMERICAN BROADCASTING AND THE FIRST AMENDMENT 197-209 (1987); MATTHEW SPITZER, SEVEN DIRTY WORDS AND SIX OTHER STORIES 7-18 (1986); R.H. Coase, The Federal Communications Commission, 2 J.L. & ECON. 1, 12-27 (1959); Laurence H. Winer, The Signal Cable Sends--Part I: Why Can't Cable Be More Like Broadcasting?, 46 MD.L.REV. 212, 218-40 (1987); Note, The Message in the Medium: The First Amendment on the Information Superhighway, 107 HARV.L.REV. 1062, 1072-74 (1994)
 
 
 [13]
 The League of Women Voters Court noted that "[t]he prevailing rationale for broadcast regulation based on spectrum scarcity has come under increasing criticism in recent years," and that "[c]ritics, including the incumbent Chairman of the FCC, charge that with the advent of cable and satellite television technology, communities now have access to such a wide variety of stations that the scarcity doctrine is obsolete." 468 U.S. at 376-77 n. 11, 104 S.Ct. at 3115-16 n. 11 (citing Mark S. Fowler & Daniel L. Brenner, A Marketplace Approach to Broadcast Regulation, 60 TEX.L.REV. 207, 221-26 (1982))
 
 
 [14]
 In 1987, the Commission explicitly provided that "signal" to the Supreme Court in holding that, "the scarcity rationale developed in the Red Lion decision and successive cases no longer justifies a different standard of First Amendment review for the electronic press. Therefore, in response to the question raised by the Supreme Court in League of Women Voters, we believe that the standard applied in Red Lion should be reconsidered and that the constitutional principles applicable to the printed press should be equally applicable to the electronic press." In re Complaint of Syracuse Peace Council against Television Station WTVH Syracuse, New York, 2 F.C.C.R. 5043, 5053 (1987); see also Matthew L. Spitzer, The Constitutionality of Licensing Broadcasters, 64 N.Y.U.L.REV. 990, 1011 (1989)
 
 
 [15]
 For a particularly thorough rejection of various scarcity arguments, see Spitzer, supra, at 1013-20, and notes 12-14 supra
 
 
 [16]
 See Spitzer, supra, at 1013-15
 
 
 [17]
 Coase demonstrated that one can efficiently distribute rights to scarce resources through a market system. See Coase, supra, at 12-27
 
 
 [18]
 This court has found that "[b]roadcast frequencies are much less scarce now than when the scarcity rationale first arose in National Broadcasting Co. ... and it appears that currently 'the number of broadcast stations ... rivals and perhaps surpasses the number of newspapers and magazines in which political messages may effectively be carried.' " Telecommunications Research & Action Ctr., 801 F.2d at 508-09 n. 4 (quoting Loveday v. FCC, 707 F.2d 1443, 1459 (D.C.Cir.), cert. denied, 464 U.S. 1008, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983)). This court went on to note, "[i]ndeed, many markets have a far greater number of broadcasting stations than newspapers." Id.; see also CASS R. SUNSTEIN, DEMOCRACY AND THE PROBLEM OF FREE SPEECH 54 (1993) (noting that most cities have far more television and radio stations than major newspapers)
 
 
 [19]
 See Spitzer, supra, at 1015; cf. Fowler & Brenner, supra, at 222-23 (suggesting that additional channels can be added without increasing portion reserved for broadcast by decreasing bandwidth of each channel and claiming that advertising dollars restrict broadcast opportunities more than number of channels)
 
 
 [20]
 Judge Bork's opinion Telecommunications Research & Action Ctr. sums up this point:
 It is certainly true that broadcast frequencies are scarce but it is unclear why that fact justifies content regulation of broadcasting in a way that would be intolerable if applied to the editorial process of the print media. All economic goods are scarce, not least the newsprint, ink, delivery trucks, computers, and other resources that go into the production and dissemination of print journalism. Not everyone who wishes to publish a newspaper, or even a pamphlet, may do so. Since scarcity is a universal fact, it can hardly explain regulation in one context and not another. The attempt to use a universal fact as a distinguishing principle necessarily leads to analytical confusion.
 801 F.2d at 508 (footnotes omitted).
 
 
 [21]
 Spitzer suggests that if one were to give paper away for free, the demand would certainly exceed the supply. See Spitzer, supra, at 1016
 
 
 [22]
 Coase presents a compelling argument for a free market system, in which we would treat broadcast rights as private property to avoid the chaos of the 1920s: after an initial allocation, ownership and use could be governed by the free market. See Coase, supra, at 12-27
 
 
 [23]
 In Joseph Burstyn, the Court faced a similar argument, "that motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression." 343 U.S. at 502, 72 S.Ct. at 780. The Court responded that, "[e]ven if one were to accept this hypothesis, it does not follow that motion pictures should be disqualified from First Amendment protection. If there be capacity for evil it may be relevant in determining the permissible scope of community control, but it does not authorize substantially unbridled censorship such as we have here." Id
 
 
 [24]
 The plurality opinion added:
 Because the broadcast audience is constantly tuning in and out, prior warnings cannot completely protect the listener or viewer from unexpected program content. To say that one may avoid further offense by turning off the radio when he hears indecent language is like saying that the remedy for an assault is to run away after the first blow.
 Pacifica, 438 U.S. at 748-49, 98 S.Ct. at 3040. This elaboration on the intrusiveness rationale, of course, does not distinguish broadcast from cable.
 
 
 [25]
 Zechariah Chafee provides a historical view of the Court's wavering toleration of speech-restrictive regulations on different media:
 Newspapers, books, pamphlets, and large meetings were for many centuries the only means of public discussion, so that the need for their protection has long been generally realized. On the other hand, when additional methods for spreading facts and ideas were introduced or greatly improved by modern inventions, writers and judges had not got into the habit of being solicitous about guarding their freedom. And so we have tolerated censorship of the mails, the importation of foreign books, the stage, the motion picture, and the radio.
 ZECHARIAH CHAFEE, FREE SPEECH IN THE UNITED STATES 381 (1942).
 
 
 [26]
 The Justices voted 8-1 on this issue, although a majority of the Court found that the regulations were content neutral and applied intermediate scrutiny on this basis. See TBS, --- U.S. at ----, 114 S.Ct. at 2469
 
 
 [27]
 An earlier Court phrased this notion as: "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972)
 
 
 [28]
 Section 16(a) applies to "language or material that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities or organs." Enforcement Order, 8 F.C.C.R. at 705 n. 10
 
 
 [29]
 At one point in its brief, the Commission attempts to narrow its interest in facilitating parents by claiming that it "aids parents who choose not to expose their children to indecent material." Brief for Respondents at 16 (citing Enforcement Order, 8 F.C.C.R. at 710). This does not absolve the Government from trampling on the rights of parents. The only difference, is that in so phrasing its interest, the Commission only clarifies the parents on whom it tramples: those parents who do not agree with the Commission about how best to raise their children
 
 
 [30]
 Were I hesitant that the Edenfield requirement to put forth some evidence of harm remained only in the commercial speech context, the Court's TBS and League of Women Voters opinions assures me that Edenfield's requirements apply more broadly. In addition, it makes sense that whatever proof is required to pass intermediate scrutiny would also be required for exacting scrutiny
 
 
 [31]
 In fact, not only did the definition of the materials at issue in Ginsberg include the concept of harm, but the appellant did not argue that the obscenity in the magazines were not harmful to minors. Ginsberg, 390 U.S. at 635, 88 S.Ct. at 1278 (noting that appellant "makes no argument that the magazines are not 'harmful to minors' within the definition" in the statute)
 
 
 [32]
 See Enforcement Order at 707 n. 36 (citing 138 CONG.REC. at S7309-10 (June 2, 1992) (statement of Sen. Helms) (citing studies: SURGEON GENERAL'S SCIENTIFIC ADVISORY COMMITTEE ON TELEVISION AND SOCIAL BEHAVIOR, TELEVISION AND GROWING UP: THE IMPACT OF TELEVISED VIOLENCE (U.S.Pub.Health Serv., 1972); Aimee D. Leifer & Donald F. Roberts, Children's Responses to Television Violence, in 2 TELEVISION AND SOCIAL BEHAVIOR 43-180 (U.S. Dep't of Health, Educ., and Welfare, John P. Murray et al. eds., 1972) [hereinafter TELEVISION AND SOCIAL BEHAVIOR]; Robert M. Liebert, Television and Social Learning: Some Relationships Between Viewing Violence and Behaving Aggressively, in 2 TELEVISION AND SOCIAL BEHAVIOR 1-42; Ellen Coughlin, Is Violence on TV Harmful to Our Health? Some Scholars, A Vocal Minority, Say No, THE CHRON. OF HIGHER EDUC., Mar. 13, 1985, at 5; Erik Eckholm, Studies Link Teen-Age Suicides, TV, N.Y. TIMES, Sept 11, 1986, at C13))
 
 
 [33]
 See Enforcement Order at 707 n. 36 (citing 138 CONG.REC. at S7309-10 (citing studies: SHEARON A. LOWERY & MELVIN L. DE FLEUR, MILESTONES IN MASS COMMUNICATION RESEARCH: MEDIA EFFECTS 406-07 (2d ed.1983); Elizabeth J. Roberts, Television and Sexual Learning in Childhood, in 2 TELEVISION AND BEHAVIOR: TEN YEARS OF SCIENTIFIC PROGRESS AND IMPLICATIONS FOR THE EIGHTIES 209-23 (Nat'l Inst. of Mental Health, David Pearl et al. eds., 1982) [hereinafter TELEVISION AND BEHAVIOR]; 1 TELEVISION AND BEHAVIOR 87 (Summary Report)))
 
 
 [34]
 See, e.g., note 2 supra
 
 
 [35]
 Counsel for the FCC noted that "[t]his [technology] really hasn't been pushed here," suggesting that the reason was expense (but citing no evidence to support the suggestion). Tr. of Oral Argument at 62. While the cost may or may not in fact be prohibitive, the Commission at a minimum should have considered less speech-restrictive options like this one
 
 
 [36]
 The majority finds that a 6 a.m. to midnight ban is the least restrictive means to further compelling interests and then goes on to find that a 6 a.m. to 10 p.m. ban is also the least restrictive means. While a 6 a.m. to 10 p.m. ban is certainly less speech restrictive than a 6 a.m. to midnight ban, it seems absurd to suggest that they are both the least restrictive means. As the majority itself notes, "the preferential safe harbor has the effect of undermining ... the constitutional viability of the more restrictive safe harbor that appears to have been Congress's principal objective in enacting section 16(a)."
 
 
 [1]
 In light of the Commission's dramatically expanding enforcement policy--from the period extending several years beyond Pacifica in which the Commission only enforced the regulation against broadcasts substantially similar to the "filthy words" monologue penalized in that case to the current, ever-increasing reach of Commission enforcement--I am at a loss to understand the majority's conclusion that "[w]hatever chilling effects may be said to inhere in the regulation ... have existed ever since the Supreme Court first upheld the FCC's enforcement of section 1464 of the Radio Act." Maj. op. at 666. As broadcasters learn of the Commission's more aggressive stance, their prophylactic measures are bound to increase
 
 
 [2]
 Although the end result of the majority's decision is to extend the safe harbor from 10 p.m. to 6 a.m., it holds that so long as Congress enacts a uniform rule, the midnight to 6 a.m. safe harbor is constitutionally adequate. Accordingly, I address my discussion to the narrower safe harbor
 
 
 [3]
 To the extent that the majority suggests that deferring to the judgment of elected official is appropriate, it is interesting to note that the American public appears to agree that the primary burden of protecting children from indecency should be on parents. While 83% of those surveyed in a recent poll believe that the entertainment industry "should make a serious effort to reduce sex and violence in movies and music and on TV," most placed the blame on parents for exposing children to sex and violence on TV. 63% felt that the federal government should not "become involved in restricting sex and violence presented by the entertainment industry." Sam Ward, Most Want Less Sex, Violence in Movies and Music, on TV, USA TODAY, June 9, 1995, at 4A
 
 
 [4]
 This assessment, of course, is made in light of the currently available means. At the moment I write, Congress is actively considering requiring a "V-chip" in all new television sets that would enable parents to block offensive speech whenever broadcast and a rating system giving the advance information on questionable programs. As such technology advances and becomes universally available, the government bears the continuing obligation to ensure that its means of regulating indecency are the least restrictive among all those available
 
 
 [5]
 The station-specific data we requested in ACT I and ACT II is nowhere to be found in the record. See ACT II, 932 F.2d at 1510